In The United States District Court
For The ~~united~~ District of Kansas

Anthony Dean Conley,
      Plaintiff,

V.

David R. McKune, et al.
      Defendants.

Case No. 11-03200-CM

## Memorandum in Opposition to Defendant's Motion For Summary Judgment
### D. Kan. Rule 56.1(b)

Anthony Dean Conley, Pro Se, respectfully submits this Memorandum in Opposition to Defendants' Motion for Summary Judgement in accordance to D. Kan. Rule 56.1(b). Plaintiff respectfully request this Court deny Defendants' Motion for Summary Judgment because there is genuine issues of material fact regarding Defendant's personal participation in the alleged Constitutional violation(s)/deprivation(s); Plaintiff's exhaustion of available Administrative Remedies; Defendant's claims of Eleventh Amendment Immunity; Defendant's claims of Qualified Immunity/Causation

### The Nature of Case & Matter Before The Court

Plaintiff Anthony D. Conley is an inmate who alleges Defendants acted with deliberate indifference

1 of 47

to a Substantial risk of Serious harm in violation
of his Eighth Amendment rights while he was incarcerated
at the Lansing Correctional Facility ("LCF") in Lansing,
Kansas. Proceeding in forma pauperis and pro se, he
filed this suit under 42 U.S.C.§ 1983, seeking money
damages and against the Corrections officers in their
individual capacities; and Injunctive relief in their
official capacities.(Doc.127, Motion to Correct a mistake)

[Controverted Facts Regarding Personal Participation/Qualified Immunity]
  I. Controverted facts as they relate to Defendant Rex Pryor
     (Doc.130, Ex A).

1. During the time of the alleged violations Rex Pryor had
a duty to oversee the overall security, Managing operations, the
developing and implementing facility policies and procedures. He
never stated he didn't have to enforce ImPP 10-115 & 10-116 nor
did he state it wasn't his duty to, enforce these policies and procedures
                         Supervise or
regarding Dental Treatment and elective procedures (Doc.130, Ex.A)
                                                              ¶7=I

2. Rex Pryor was aware of plaintiff's dental complaints  because
he received an informal resolution dated May 31, 2011. It (letter)
was addressed correctly, and had the correct postage. The
Informal Resolution was mailed with a witness witnessing it
being mailed. It was notarized and an affidavit of mailing

Was executed. The informal resolution sent to Rex Pryor never got sent back to Plaintiff (return to sender). Pryor never responded to the informal resolution and an affidavit of non-response was executed. (Doc. 68 Sworn 1st Amend. Compl. pg. 3 - 9)(Doc. 118 Mrtz. Rept. Ex. F ~~Pg~~ Part 2 pg 95-104). Staff stated [all] got their Inf. resolutions ( Doc. 68, pg 12-13)

3.   The informal Resolution contained sufficient information to put Rex Pryor on notice that Plaintiff has (was) and still suffering from a serious dental condition and mental Health condition regarding dental problems, suicide contemplation. Pryor was placed on notice that Plaintiff was requesting the current policies governing elective Dental procedures. He was placed on notice that ~~he~~ Plaintiff wasn't being treated by any dentist at the time of his receipt of the informal resolution. Pryor Knew that plaintiff's dental condition was worthy of comment by Keith Murray. Pryor Knew that the dentist never explicitly stated that "Braces/and or Cosmetic restoration wasn't medically necessary or innapropriate to treat Plaintiff's serious dental and/or mental Health needs". Doc. 68, pg. 3-9)(Doc. 118 Ex. F part² pg. 95-104)

4. Pryor was aware that from ~~March 23~~ March 27, 2011 until May 23, 2011 was how long it took from the time Plaintiff

turned in a sick call slip to actually see a dentist for his untreated serious dental needs. (Doc 68, pg 3-9)(Doc.118 Ex. F part 2 pg 95-104) Pryor knew Plaintiff was suffering

5. Pryor was also placed on notice again by Dentist Keith Murray that plaintiff needed braces/or Cosmetic Dental procedures performed on him to preserve his life. Pryor (Doc. 68, pg. 12-13)

6. Pryor who acted as cowardens the Warden's designee pursuant to KAR 44-15-102 (A)(i) ascertained the nature of plaintiffs grievance (grievance# AA20110572) obtained more knowledge and awareness of plaintiffs serious medical Dental needs and them being untreated (Doc.118 Ex. F Part 1, pg 14-25).

7. Pryor ascertained/investigated and discovered that Dental staff clearly stated:." Additionally it was determined that you were seen evaluated by Dental staff on May 23, 2011 for your issue. It was determined at that time that to Correct your Various dental problems you would require braces. CCS does not provide nor do they perform elective Cosmetic dentistry work such as this. No other action is deemed necessary". (Doc. 118 Ex.F. Prt.1, pg 21)

8. Rex Pryor Knew Plaintiff suffered from a serious Dental medical need, disregarded a serious risk to plaintiff's health, and failed to take reasonable steps to abate it and or failed to take corrective actions when faced with numerous complaints (Doc. 68 pg 3-9 ; Doc.118 Ex.F. prt 2 pg 95-104 ; Doc. 68, pg. 12-13 ; Doc. 118 Ex. F. Prt I, pg 14-25). He approved for Plaintiff to be sent to supermax. (Ex. D)

9. Pryor Knew all of this information regarding plaintiffs untreated serious need Dental needs, non-treatment and also the fact that Plaintiff had a Hard 40 (Forty to Life Sentence) and still denied plaintiff cosmetic dental procedures because the procedures were "elective" and not provided by CCS. Plaintiff's Conviction/Sentencing Sheet was part of the documents attached to the grievance when Pryor denied the grievance (Doc. 118 Ex. F Prt I pg 25)

10. Pryor also acted with deliberate indifference when he made statements saying Plaintiff will never be treated in his clinic because he was complaining about his teeth ; filing informal resolutions and grievances ; Forced him to use unprescribed Marijuana to treat his Dental Condition and marked "no psychological

or Medical intervention on plaintiffs Seg review sheet (which "Ex. A"
is evidence Pryor had contact with plaintiff). Pryor also
ripped Plaintiffs' Sign down reading in it and balled it
up and put it in his pocket when the signed clearly stated
his plaintiffs request for ~~mental health~~ treatment. (Doc. 68, pg. 21
Sworn 1st Amend Cmpl) (Ex. A)(Ex. B)(Ex. D)(Ex. Doc 118 Ex at 3)
BDD diagnosis.

11. Inmate Richard Rivera #68647 executed a sworn affidavit
Supporting Plaintiffs claim of Serious Dental needs and requesting
medical marijuana to treat his dental condition. (Doc 119 Ex. B-5
pg. 24) He was in segregation with plaintiff around the
time Pryor displayed deliberate indifference (Doc. 68 pg 21)
Ex A )

12. Furthermore Pryor was also made aware of Plaintiffs'
Serious Dental & Mental Health needs through another
Correspondence. In that letter Plaintiff laid everything
out to him and the other defendants concerning: His serious
dental and Mental Health needs; Unanswered Sick Call Slips; Forced
Self-treatment; retaliation; Being shut out of the clinic; The Success
of the forced self-treatment (Marijuana etc); "My addiction and life
dependency upon my forced self-treatment". The sick call slips
attached (Plaintiffs' requesting elective procedure(s).) let him
Know I still haven't been treated and still Suffering Since and
~~receiving Disciplinary~~

March of 2011 all the way up until he received the
Sworn letter dated 8-22-2012. Proyor knew from
informal resolutions grievances and the 8-22-2012
letter that plaintiff has been without treatment for
17-months for his ~~dented~~ serious dental needs and
still suffering (Doc. 65, Sworn letter). Staff even
stated that [all] the defendants received Doc. 65 (Doc. 68
pg. 24 sworn 1st Amend Complt). He knew plaintiff was still suffering; untreated

13. There is/are disputed material facts implicating that the
two questions of whether: Plaintiff had a serious
Dental/~~medic~~ mental Health need; and whether Rex Pryor
was "aware" of facts from which an inference could be drawn
that a substantial risk of medical/Dental/mental harm existed
and whether he drew that inference. (Doc. 68, pg. 21; Doc. 68 pg 3-9, 12-13) (Doc. 65)
(Doc. 118 Ex. F. Prt. I, pg 14-25)

14.

14. There are disputed material facts implicating that Rex Pryor
personally participated in the alleged Constitutional deprivation by
failing to take Corrective action, exercise Control; failure to supervise:
~~tho~~ When he was involved in the grievance process (Informal Resolutions; Grievance);
when he failed to enforce policies ~~ImPP 10-113~~ ImPP 10-115, 10-116; when he failed
to investigate the possibilities of pharmaceutical intervention with medical
Marijuana; when he used his authority to shut plaintiff out of Clinical/Dental
services for almost a year forcing him to self-treat; [when he failed

7 of 47

to initiate policy change under IMPP 01-101 to: Allow for the wardens to be an alternate policy maker/Authority under, to make IMPP 10-115 decisions on wether inmates receive non-essential medical or Dental Services; when he failed to initiate policy change under IMPP 01-101 to allow medical marijuana to be approved experimental treatment for pain and mental Health reasons; when he failed to initiate, and/ under Impp 01-101 or Supervise and create an institutional policy to allow treatment with medical marijuana. (Doc. 68, 3-9, 12-13, pg 21)(Doc. 65)(Doc. 118 Ex F, pg. part 2 pg 95-104) (Doc. 125 pg 9-14) (Doc.130 Ex. A.)(Ex I)

15. There are/is disputed facts as to causation. Plaintiff alleged several times that as a result of Defendants inactions/actions and deliberate indifference to Plaintiffs serious dental/medical/mental Health needs he suffered prolonged pain and suffering, choking, chewing holes in mouth, life dependency on marijuana, Chronic pain, Suicide attempts as a result of fryer and defendants deliberate indifference (Doc.68 pg 21) (Doc 68 pg 22) (Doc 68 pg 40-42).

II. Controverted facts as they relate to Defendant Kyle Deere.

16. Deere clearly stated that it was his duty to supervise medical services and the Contracto between CCS and LCF (Doc.129 Ex.B. at I) (Doc.119 pg 9 KSA 75-5252).

17. Deere also stated that it was his duty to oversee

8 of 44

Custody Classification which includes disciplinary proceedings and documentations this also includes approving or disapproving disciplinary sanctions. This also includes examining documents summonses, Disciplinary reports, Disciplinary appeals/proceedings and approving and disapproving such documents and proceedings. (Doc. 129, Ex.B at 1)(Ex.B) (Ex.B.1-4) (Ex.C)(Ex.I, KSA 75-5249). (Ex.B 1-4)

18. Kyle Deere also has the authority to issue orders regarding the operation of medical services and implement policy regarding medical services and creating policies regarding treatment, and operations of medical services.(Ex.I, KSA 75-5249)(Doc.119, pg.9 KSA 75-5252 (a)(b)(c).)

19. Kyle Deere denies that he is not aware of plaintiff but only through this lawsuit and he never received a correspondence from plaintiff (Doc.130 Ex.B at 3). This is in dispute because Deere in fact received an Informal Resolution from plaintiff because he was a CC: recipient of an Informal resolution regarding Plaintiffs serious Dental and mental Health needs. It was properly addressed, with proper postage, mailed in front of a witness, and Affidavit of Delivery executed. Deere's CC: Copy never was returned or lost. Mailing was Successful. (Doc. 68 pg 39) (Doc. 118, Ex.F part 2 pg 95-104) Staff informed Plaintiff Deere received his Copy (Doc. 68, pg 12-13). Deere was Completely aware of all of Plaintiff's letters writing

and Correspondences Concerning his serious dental and mental health needs because he stated: "You're getting on our nerves with all your letter writing". (Doc. 68 at 47), This regarding Constant Dental Complaints.

20. In that informal Resolution (Doc. 118, Ex. F part 2, pg 95-104) Deere was aware of serious dental problems, Serious mental Health problems; Search for Dental Policy governing Dental procedures. He was also aware of Plaintiff not being treated at that time and suffered for months without treatment (Doc 68, pg 3-9)

21. Deere was also informed by Dentist Keith Murray that plaintiff required Braces/Cosmetic Dental restoration to preserve his life (Doc 68 pg 12-13).

22. Deere was also aware of plaintiffs chronic Complaints about Dental treatment for his serious Dental needs because plaintiff signed everyone of his Disciplinary reports and Summonses requesting Dental treatment Deere stated: "Just because you sign your disciplinary reports saying that you need dental; Mental Health treatment any you're using marijuana is gonna save you I'm still gonna take your visits and your still gonna get nothing from that Clinic and your still gonna choke to death (choking on food). (Doc. 68 at 47) (Doc. 42) (Ex. B2, B-3) (Doc. 42;43). Plaintiff has had 30+ disciplinary reports signed requesting dental treatment (Ex B-2, B-3) (Ex. G-1, G-2 Disciplinary History) most of these

See
Ex-B-C
Attached
signed D.R's

Summonses, ~~trare~~ and D.Rs were reviewed by Deere

23. Deere also stated he never encounted Plaintiff and never recognized any dental problems or mental problems. (Doc 130 Ex.A at 6) This is in dispute because plaintiffs fang protrudes if he doesnt force his lips over his teeth and sticks his jaw out. The fangs protrude to where they are visible (Ex.G) This picture is dated 2½ weeks after Deeres Jine encounter (Doc 68 at 47) (Ex.G).

24. Plaintiffs clear visible Dental condition and mental health decline can be infered by Deere and Pryor (Doc 52) "Before's After Picture". This picture rebutts there statements (Doc 130, Ex A at 6 & Ex B at 6)

25. Deere was also placed on notice of Plaintiffs serious Dental and Mental Health needs (Doc 65). Deere at the time of his receipt of this letter he knew Plaintiff had been suffering for almost a year and a half without dental treatment. From the time Deere received his informal resolution up to the time he received Doc.65 a year and a half had passed and he knew plaintiff was suffering in between that time by examining his ~~plar~~. Disciplinary Summonses, Reports, and Documents (Doc.68 at 47).

26. Deere, at the June 1, 2012 encounter with
plaintiff was aware of numerous dental complaints, his
choking on food, his not being allowed in Medical
services, his forced self treatment due to being
denied dental treatment, his letters to the judge
begging for help to get treatment, his suicidal
tendencies will be used as a cover-up of his
murder (Doc 118, Ex.F part 2 pg 95-104)(Doc.68 pg
3-9½ 12-13)(Doc 68. at 47)(Doc.65, letter)(Doc#'s 21, 22, 23)
(Doc.68 at 28) The Dental/mental Health records show a Gap in during this time)
☞. (Doc 118
Dental & mental
Health
records)

27. Plaintiff was informed by medical staff that Deere received
his copy of Doc.65 (Doc.68 at 24), Deere was aware of Serious Needs

28. Deere's personal Participation has been pleaded
and alleged supported by evidence. Deere had Knowledge
of plaintiff's Serious Dental Needs and could draw the
inference that it was Serious but failed to take
reasonable steps to abate them. He failed to take
Corrective action, failed to supervise and enforce
Dental and elective treatment policies under
IMPP 10-115, 10-116, He used his Authority to deny
plaintiff Access to the clinic and dental services (memo at 26)
memo in opposition
memorandum in opposition

29. Deere is not entitled to Qualified Immunity (at 26)

III. Controverted facts as they relate to Defendant Brett Peterson.

30.   Petersons job is to Manage Policy and the Compliance to those policies, KDOC & Facility policy. (Doc. 130, Ex C. at 1)

31.   His job is also to supervise the grievance ~~entire~~ process especially those grievances appealed to the warden (Doc. 130 Ex C at 1)

32.   Peterson swore that he is familiar with plaintiff because he reviewed [all] grievances he filed and [all] Correspondences sent to the LCF Warden, David R. McKune (Doc 130, Ex C at 2). This also verifies that all the "informal Resolutions and Correspondences" were received by McKune, Deere, Pryor & Peterson via cc. copies because Copies of each "informal Resolution & Correspondence" were sent at the Same time to defendants (Doc. 118 Ex. F prt 2 at 96). Peterson statements Casts shade on Pryor & Deeres Affidavits denying receipt.

33.   Peterson is not relieved of his Culpable mindstate because he responded to the very "first" grievance or reviewed it and made an appointment with the Dentist before plaintiff began his 2-year Campaign with Informal resolutions & Correspondences to receive Dental treatment for his serious Dental needs. (Doc 118 Ex F. prt 1 at 23 "Memo from Peterson dated [5-17-11] Telling Parks he made a dentist Appt". )

34. Eventhough this very first Grievance, filed by plaintiff pre-dates all Informal Resolutions and Correspondences Concerning being shut out the Clinic, denial of Dental treatment, and prolonged suffering—Peterson infered from that grievance and the information within the grievance that Plaintiff's Dental needs were serious that when he contacted the Clinic on 5-17-11 to make an appointment I was seen (6) days later by the dentist despite the fact the Dental Department was (2)-months behind schedule (Doc. 118 Ex. F. prt I at 14 "Unit Team Response", $\frac{3}{4}$ at 23 "Petersons memo"). (Doc. 118 Ex. F. prt I pg 1-25 Grievance# AA201105 72)

35. Peterson Knew and Could infer from Grievance # AA201105 72 that plaintiff had a serious dental need, and that Orthodontic procedures were necessary because he never Contacted Dentist Keith Murry who examined Plaintiff (Doc 130 Ex.C.) to ascertain Plaintiffs Condition from him. Nor did Dentist Murray Contact Peterson to tell him that Plaintiff didn't need orthodontic procedures.(Doc. 130, Ex.F at 5). Peterson never identified which dental staff he Contacted and he never stated in his Affidavit that orthodontic procedures Would be inappropriate or non-effective (Doc 130. Ex. C at 4).

36. The evidence shows that Peterson received a grievance evidencing a serious dental need, made an emergency appointment within 6 days, and received a response when plaintiff appealed the grievance to the Warden that: "Braces were [required] to fix your [various]

dental problems", but we don't do Elective procedures
as this. and No further action is necessary "(Doc. 130. Ex. F prt 1
at 21). Peterson never enforced Specific Enforcement of "IMPP 10-116 IV (B), when
he became aware that Plaintiff's treatment fell outside of the
professional capabilities of the facility dental staff, and wasn't
referred to an outside orthodontics/dental specialist, when
he could inferr that plaintiff had a Serious Dental need that
was going untreated. Peterson also Knew plaintiff had an
irrepairable Serious dental need because he was aware
plaintiff had a 40-Life Sentence (Hard 40)(Doc.118 Ex. F part
1 at 25 "Grievance# AA2011 0572 Display Conviction Information").
Treatment was indicated but it was denied because it was elective.

37. Peterson was also placed on notice that plaintiff had
a Serious Dental Need that he was suffering from, which was
not treated & which plaintiff was requesting dental policy
When he received the Informal resolution a day or two
before the response to grievance# AA2011 0572 (Doc. 118 Ex F. part 2
at 95-104 Informal Resolution dated 5-31-2011). Peterson never
Supervised the enforcement of IMPP 10-115 & 10-116 nor took Corrective
action when supervising the grievance process.

38. Petersons Culpability is also established when Dentist
Keith Murray told Peterson that Plaintiff needed cosmetic
dental procedures to preserve his life. (Doc. 68 at 12-13)

39. Plaintiff also alleged a medical Cover-up/~~of this~~ (medical road Block) of his serious dental Condition, in which him and the other Defendants acquiesced, Condoned, facilitated, approved and/or turned a blind eye to, that stemmed from this meeting (Doc. 68 at 12-13)

40. Peterson's knowledge, awareness and culpability is evidenced in his ~~for~~ review of ~~this~~ plaintiffs grievance Appeal No. "Not given a Number" (Doc. 68 at 13-14). This grievance was appealed ~~to~~ to the Warden which Peterson swore he reviews all grievances Appealed to the Warden (Doc. 130 Ex. C at 1)(Doc 118 Ex. F part 2 at ~~78~~75-123)

41. Plaintiff alleged in the Sworn Complaint detailed information Concerning all the exhibits and Documentation attached to grievance No. Not Given a Number that was appealed to the Warden (Doc. 68, at 13-14). When Peterson was in receipt of this grievance appeal he was fully aware of Plaintiffs serious dental Condition still not being treated, Sick call Slips that were not answered detailing ~~corrected~~ several request for treatment of his serious dental need, The total rejection and refusal to respond to ~~take~~ Plaintiffs Informal Resolutions/ Grievance letters on behalf of Brett Petterson and the other Defendants, Plaintiff being shut out of dental Services. Peterson instead of Supervising the enforcement of Dental Policies and Failing to take Corrective Action he Condoned Park's behavior/actions/response and only sent

plaintiff to Mental Health and not dental services at
the facility (Doc 118 Ex. F part 2 at 77 "Response to Grievance by
Parks"; at 77-78 "Notarized list of all Documents attached to
the grievance")

42. Peterson not only acquiesced to Mr. Parks sending Plaintiff
to mental Health and not the dental services but Peterson
Condoned, and acquiesced and facilitated the denial response
to this grievance by labeling this grievance as a
"repetitive filing" with all those exhibits and documentations
attached (Doc 118 Ex F. part 2 at 75 )(Doc 68 at 13-14)

43. Peterson Swore in his Affidavit that he has reviewed
any Correspondences sent to Warden McKune. He also
never stated he "did not review the Informal Resolution
and other letters sent to McKune (Doc 130 Ex C. at 2)

44. Peterson therefore was in receipt of "Doc. 65." Peterson
never denied receiving this document (Doc. 130 Ex C). In Document
65 it detailed serious dental problems that have still went
untreated, suicide attempts, being forced to treat his dental
and mental pain with medical Marijuana, Mental Health staff
not being able to treat my problems, Being indigent and
not being able to buy dental floss to remove the Choking
particles of food from in between my teeth, Ellen Bartz

denying Plaintiff his electric razor in retaliation for complaining about his dental condition, Ellen Barte controling my mental health Counselor and telling him to not accept any more mental health Writings if they are not approved by her, Plaintiff informed Peterson about IMPP 10-115, 10-116. Plaintiff informed Peterson he was forced to hold mental Health sessions with the Court because he was shut out of the clinic. Plaintiff informed Peterson that he was kicked out of the clinic by Defendant Parks' wife Ms Parks. (Doc.65); Chronic Dental Pain.

45. Plaintiff put Peterson on Notice that he was still Chewing holes on the insides of his mouth, choking on food, and still having problems. (Doc 65)

46. By the time Peterson and the rest of the defendants received Doc.65 Peterson Knew that from the first grievance, when he arranged a dental appointment resulting in no treatment at all that Plaintiff had went from June 1, 2011 all the way until August 22, 2012 (14 months) without any treatment for his serious dental condition. Not to mention all the grievance Appeals in between that time explaining that Plaintiff was still suffering and being shut out of dental services. (Doc. 118 Ex.F part 2 at 75-123)(Doc 118 Ex.F part I at 14-25) Peterson still failed to take Corrective action.

45. The evidence pointed out by plaintiff shows that he had a serious Dental Condition and ~~the~~ Peterson disregarded an excessive risk to inmates/Plaintiffs health and safety. The record shows that he was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and he drew that inference.

46. IMPP 10-115 clearly raises the presumption that plaintiffs Dental needs were serious (IMPP 10-115 I(A)(i)(3)(D)(6)). Plaintiff clearly fit the criteria of a serious medical need under this IMPP which Peterson knew needed to be treated as soon as possible according to the mandate of this IMPP. (~~IMPP~~ Doc 118 Ex. H at I).

47. Peterson's Affidavit never stated that he contacted any (Doc 130 Ex C) medical or dental staff ~~that after~~ ~~the Jone~~ after receiving Doc. 65 nor did he refer plaintiff to the dentist even when there were sick call slips attached to Doc 65 at 21-24). Nor did his affidavit state he sent plaintiff to mental Health ~~or~~ nor investigated to see if he was receiving mental Health treatment after receiving Doc. 65. Peterson stated he never noticed any dental Condition, or if I was in pain (Doc 130 Ex C at 6). Plaintiffs dental Condition is naturally visible "(Ex. G part 1, Kasper Page)". This picture was taken before Peterson's physical encounter with plaintiff (Doc 68 at 47)

IV. Controverted facts as they relate to Defendant Parks.

48. Parks swears that he is familiar with with plaintiff because he "reviewed" and responded to [any] grievance or form 9 he had filed. (Doc. 130 Ex. D at 2).

49. Parks is aware of Plaintiffs many grievances he filed regarding his dental condition while Plaintiff was assignd to Parks caseload. (Doc. 130 Ex. D at 3) His personal Participation is evidenced in the record

50. Plaintiff agrees that Parks did respond to his grievance, But Parks never Consulted with any dental staff when Conley filed those grievances. Parks clearly told Plaintiff the was scheduled to see the dentist but Parks never talked to any dental staff (about Dental) because the responses he gave verifies this (Doc 118 Ex. F at 14 "Unit Team Response by Parks). Plaintiffs Condition hasn't/wasn't evaluated yet (at 14) (Regarding grievance # AA20110572 the first grievance).

51. Parks never investigated the grievance, Parks took that grievance to Defendant Brett Peterson so he could handle it (Doc. 118 Ex. F at 23 "Memorandum from Parks to Peterson). Parks asked Peterson to respond to the grievance (at 23). "grievance #AA20110572"

52. Parks never actually sought advice or information Concerning Plaintiffs Serious dental needs from dental staff. No dentist told him Cosmetic

dental procedures were not medically necessary nor inappropriate for
pain management. (Doc 118 Ex. F at 14). His culpable mindstate is in dispute.

53. Parks culpable mindstate is still in dispute. Plaintiff also shows
that Parks considered Mr. Conley's complaint and dental needs were
serious because he felt the situation was of such a complex serious
nature he sought help from his superior Brett Peterson. (Doc. 118 ex. F at 23) "Memo"

54. Just Because Parks Sought help on the grievance does not free him from
liability. There was another grievance that was filed right after that (Doc.118
Ex F. at 75 - 123) "Grievance Not Given a Number".

55 When Parks received "Grievance Not Given a Number" he was aware from the 1st
Grievance# AA20105'72 that Plaintiffs serious medical/Dental needs were "not"
being treated because although Cosmetic procedures were required to fix
plaintiffs serious Dental needs the procedures were elective and Plaintiff
was "electing" to have treatment with those elective procedures. (Doc.118 Ex F at
77 "Unit Team Response").

56. Parks was aware of several facts that dispute his culpable mindstate. (Doc. 68
at 13-14). Evidence shows that Peterson was deliberately Indifferent to Known Serious Dental

57. When Parks reviewed Plaintiffs second grievance there was so much
nformation and exhibits attached that a jury can decide that he was
faced with facts that Parks could determine were serious (Doc. 68 at 13-14)

58. When Parks received grievance No. "Not Given a Number" by the plaintiff it had: The received, but un-answered Informal Resolutions of the Defendants, Several unanswered sick call slips that were turned in but unanswered that requested Dental treatment for Plaintiffs untreated serious dental condition and unanswered mental health sick call slips. (Doc 118 Ex. F at 77-123) (Doc 68 at 13-14).

59. Parks instead of taking Corrective action when faced with a serious dental need acquiesced, condoned, and/or disregarded a risk of substantial harm to plaintiff by [only] reciting what Peterson Pryor stated in his grievance response Concerning elective treatment and refusing to contact the Dental Department to arrange an appointment but instead making arrangements for plaintiff to see the Mental Health specialist (Doc 118 Ex F at 77 "Unit Team response", Compare it to "Pryor's response" Doc 118 Ex. F at 124) Parks just gave a mindless recitation of what Pryor and Peterson Collaborated on in their response, despite there were unanswered dental sick call slips. (Doc. 118 Ex. F at 111 to 122)

60. Also Parks told me my "dental sick call slips will never be answered". He also stated "the Warden(s) won't allow for you to keep pressing the teeth issue", "Your gonna have to live with your dental problem", " I don't care about your sick call slips, as long as you press this dental Issue your beat". (Doc 68 at 15). Plaintiff was threatened by Parks with being sent to a Max/supermax Facility (Doc 68 at 15) This was corroborated with the sworn statement of Inmate Washington (Doc 68 at 15) (Doc 119 pg. 22)

61. Parks also knew that Plaintiff's untreated Dental Condition causes him to choke when he stated: "Hopefully you'll Choke to death". (Doc. 68 at 15) Parks refused to take Corrective Action.

62. Parks statement that he could not visibly tell Plaintiff had a serious dental Condition is refuted by the pictures (Doc 130 Ex.D at 6) (See Ex 6 pt 1 attached "Kasper Picture). Plaintiff's teeth have always been visible in Conversation and his fangs protrude.

Controverted

V. Facts as they relate to Defendant Bryan.

63. Bryan's affidavit swears he was familiar with Plaintiff only because he was housed at the medium facility (Doc. 130 Ex. E at 2)

64. Bryan had sufficient knowledge that Plaintiff had a serious dental need that he Complained frequently about to the Wardens (Doc 68. pg 17)

65. Bryan knew that plaintiff filed grievances (Doc. 68 pg 17). Bryan knew that Plaintiff's Sick Call Slips were being denied. Bryan said he was sent by the wardens office to get plaintiff out of the medium. (Doc. 68 pg. 17), Bryan told plaintiff plaintiff he wouldn't get any treatment if he fought the D.R.s or Appealed them. (Doc. 68) Bryan knew plaintiffs dental Condition Causes him to Choke of food and he told plaintiff to "choke on that." (Doc. 68 pg 17)

66. A jury can determine ~~or~~ that Bryan ~~star~~ had knowledge of Plaintiff's Condition and situation divulged to him from/by the Defendants. They can also determine that he worked in Harmony with Parks to get him out of the medium. (Doc. 68 at 15 Parks statements and Washington Affidavit) (Doc. 119 pg 22)

67. Parks and Bryan's Collusion is also evidenced by the fact that Parks ~~signed~~ and approved Bryan's ~~disci~~ disciplinary report that he had written against plaintiff for trying to obtain Dental treatment for his serious dental condition (Doc. 118 Ex. D at pg 4 "Park's signature Approving the disciplinary report")

68. Bryan Stated he couldn't visibly ~~do~~ see Plaintiff's ~~den~~ serious dental condition (Doc. 130 Ex. E at 7). This is refuted by Plaintiffs exhibit Attached (Ex G prt I Kasper Picture). Plaintiff's dental Condition is visible.

A. Bryan Knew all this private information about plaintiff's grievances and dental condition and Plaintiff never told him. How did Bryan Know all of this about Plaintiff? (Doc. 68 at 15,17)

70. (Doc. 130 Ex. E at 8) There is no provisions in the K.A.R. that will overturn a disciplinary report because a staff was deliberately indifferent toward a prisoners serious Dental Need. So there was no reason to bring it up in the disciplinary process/Hearing

71. Bryan was deliberately indifferent toward plaintiffs serious dental needs. He knew of and disregarded an excessive risk to plaintiffs health and safety. The evidence shows Bryan was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and he drew that inference (Doc. 68 at 17)

VI. Controverted Facts as they Relate to (Dentist) Keith Murray's Affidavit and it's insufficiency to support Summary Judgement to any claims.
[Doc 130 Ex. F]

72. Murray stated that he never concluded that plaintiff required further dental or orthodontic treatment for medical reasons or to preserve his life (Doc 130 Ex F at 2). This is refuted by Plaintiffs Sworn complaint and Pryor and Petersons response to Grievance# AA20110572 (Doc 118 Ex. F page 21) (Doc #68 at 2). This is also refuted by the sworn Informal Resolutions as well (Doc 118 Ex F. at 100)(Doc. 68 at 12-13).

(Doc. 130 Ex. F at 3):
73. Murrays statement that plaintiff had "normal dentition" (normally alligned teeth) is not supported by any medical Dental X-Rays (Doc 118 Ex A. 1-13). This statement is refuted by Plaintiff's Kasper Picture that is attached to this memorandum (See Ex. C prt 1). Plaintiffs fangs are visible and force his lips upward.

74. Murrays statement (at 3) that he never saw any irritation, lacerations, or ulcerations on Conley's inner cheeks, nor any scaring of the Plaintiffs inner cheeks is refuted by Plaintiffs Sworn complaint and Sworn Informal resolutions concerning his apparent Fang wounds (Doc 68 at 2)(Doc 118 Ex. F at 100).

75.

Murray's Comment (Doc 130 Ex. F at 3) that he told Plaintiff we don't do braces ~~verifies~~ ~~that~~ was an unsolicited ~~unsolicited~~ comment about Braces meaning Plaintiff never told Murray he wanted braces nor needed braces. Murray found ~~it~~ Plaintiffs Condition worthy of comment on his own. Plaintiffs complaint (Doc. 68 at 1-2) never stated he said anything to Murray about Braces. Murray Stated in his affidavit (Doc 130 Ex. F at ~~3~~ 5) that he didn't speak to anyone about grievances ~~or~~ nor did he speak to defendants about Plaintiffs dental Condition. Also his affidavit never (Doc 130 Ex.F) ~~at~~ stated plaintiff even inquired or asked about braces period. No where in the record period does it State Conley asked Murray about Cosmetic Dental Restoration or Braces at his dental examination on May 23, 2011. No, Murray found Plaintiffs dental Condition worthy of comment, Murray brought it up Plaintiff didn't.


76. The ~~Dentists~~ Statement by Murray that plaintiff had "normal dentition" (see Doc. 130 Ex. F at 3) is refutted by another dentists findings. ~~that~~ Dentist Jose Lopez reported that he gave Plaintiff the choice of having his sharp Canine teeth filed down to remove sharp Surfaces (Doc 118 Ex A pg 19 "Dental Exam dated 5-30-2013) This finding also refutes Murrays Statement that Plaintiff had no scarring, tears or lacerations etc (Doc.130 Ex. F at 3-4). A dentist that Seen the plaintiff on 7-26-13 after Murray seen plaintiff made findings that refutes Murray's statement that he saw no lacerations on the insides of his cheek. Dentist Brian Ahern stated "Facial erosion of tooth #11 and Trauma to cheek (Doc 118 Ex. A. at 11 "Dental Progress note dated 7-26-2013") And Crowding). These findings of Dentist Lopez's Dentist ~~be~~ Ahern ~~contradict~~ Murray's affidavit ~~stat~~ Statement procedures would be for purely Cosmetic reasons. (~~see~~ Doc. 130 ~~at~~ Ex. F at 4,3,7)

77. Plaintiff alleged a Dental Cover up being participated in by Murray (Doc. 68 at 12-13). Also plaintiff has a document that Shows the HSA Ellen Bartz tried to cover up dental records and mis-represent them (Doc. 64) She also was misplacing Dental sick call slips (Doc. 64).

76. There is a pattern that Murray Witholts information from Plaintiffs dental records. (Doc 118 Ex A 1-19). All the Dentist before him notice fangs, cavities, carries, fillings needed and the Dentist after him notice these (lacerations) things as well but Not Murray he doesn't log that stuff down (Doc. 118 Ex A 1-19). A jury can reach the assumption that Murray is not being Completely honest about Plaintiffs Dental Condition and records,

77. (Doc 130 Ex.F at 5 and 7) Murray's affidavit states he never spoke to anyone about plaintiffs Condition but the grievance response from Rex Pryor; Brett Peterson Casts shade on this statement. The response stated that during the May 23, 2011 dental visit with Murray it was determined that to fix my [various] dental needs braces were required but the procedures were elective and not provided by CCS. (Doc 118 Ex F. at 21 "Grievance Response to Grievance# AA201057). The meeting in which Rex Pryor; Murray attended, Pryor Stated that He "spilled the beans" about Plaintiffs Dental treatment (Doc. 68 at 12-13) Murray [never] explicitly stated "on record" that Cosmetic Dental Procedures were "medically necessary" but he never explicitly stated that the procedures were not Medically required or necessary. He stated to plaintiff they were necessary and at the meeting (Doc 68 at 2, at 12-13). Murray's Affidavit does not Conclude why he felt the Procedures were Completely Cosmetic (Doc 130 Ex F)

VII. Controverted Facts as they relate to Murray's Affidavit, its insufficiency and failure to raise Issue(s) of Material fact to support Deffendants Motion for Summary Judgement. (Doc.130 Ex.F at 1-7)

OBJECTION

78. (Doc.130 Ex.F at 1-7) Murray's statements of Normal Dentition (Normally alligned teeth) is not supported by any Dental X-Rays Whatsoever (Doc.118 Ex.A at 1-19). Dentist Murray made a Contradictory statement that casts shade on his statement that Plaintiffs' teeth are normally aligned, before the May 23, 2011 dental visit where he told Plaintiff he needed Cosmetic Dental procedures. On 10-12-2009 he wrote in Plaintiffs Dental records that there was: "occlusion crowding max ant". (Doc.118 Ex.A at 8) This was two years prior. Also After all this, on 5-30-2013 Dentist Jose Lopez recorded Sharp Canines. (Doc.118 Ex. at 19)

79. Dentist Murray's affidavit (Doc.130 Ex.F at 1-7) Does not raise any issue of material fact regarding plaintiffs claims. (See Doc.68. at 1-2) Plaintiff Complained about his crowded teeth Caused him to choke on food particles that dislodge from in between his overlapped/crowded teeth; Not being able to hold saliva in his mouth; Biting holes in his mouth when he eats; Choking on flesh particles; Impairs social functioning; Speaking problem caused by teeth; Plaintiff Complained about teeth function as being able to chew; Not being able to close mouth, protruding fangs that are visible; psychological silence not speaking; breathing problems. The mental Health problems problems stemming from the discoloration, appearance, and overall Condition of teeth; Sharp fangs and suicide attempts. ] (Doc.68 at 1-2) ⇒

(Doc. 118 Ex. F at 97-103 Informal Resolution sent to Murray), Murray's affidavit never states he did not receive that correspondence. Murray received his cc: copy of the Plaintiffs Informal resolution. (Doc 68 at 6 "cc: copy to Dr. Murray") (Doc. 68 at 3-8) Everything Alleged in Complaint & Informal Resolution. Dentist Murray's affidavit doesn't even address all thes claims and allegations raised in the Complaint or Informal Resolution.. Murray's affidavit is (Doc.130 Ex.F) Conclusory and without specific supporting facts to support summary Judgment to Plaintiffs Claims. Plaintiffs raised several complaints concerning his serious dental needs in the sworn Complaint and informal resolution that were brought to his attention but his affidavit doesn't even raise a genuine issue regarding these claims, allegations or exhibits. His affidavit is insufficient to support summary judgment and his statements are not supported by the medical Records or Dental X-rays (Doc.130 Ex F)

## VIII. Controverted Facts as they relate to Plaintiffs Dental Appointments & Murray's Affidavit

30. Plaintiff has always Complained of dental pain but he alleged that the Dentist p do not log it in (Doc 119 at pg 1)"Notarized Sworn Traverse" This is also supported by Ellen Bartz falsifying/misrepresenting medical records (Doc. 64) This is also supported by Plaintiffs sworn complaint regarding a dental record Cover-up (Doc. 68 at 12-13). Things in Plaintiffs records are mysteriously left out!

31. Plaintiffs Dental records never state Plaintiff did not require braces or Cosmetic Dental restoration. Nor do Plaintiffs dental records state

braces or cosmetic dental restoration were not medically necessary (Doc 118 Ex. A 1-19).

82. Dentist Murrays dental examination records do not explicitly state that he did not see irritation, lacerations, or ulcerations on Conley's lips or inner cheeks. ~~The dental examination records do not explicitly state~~ ~~Murray did not see any scarring of the Mucose (Lips or inside of~~ cheeks (See Murray's Affidavit Doc. 130 Ex F. at 3,4 and compare it to his May 23, 2011 Dental examination of Plaintiff). The medical/Dental records do not support his findings or Affidavit see Murrays May 23, 2011 dental examination record (Doc 118 Ex.A at 10). Plaintiff never complained of scaring only lacerations, irritation and ulceration and murrays medical examination findings do not report that.

83. Dentist Brian Ahern ~~was does~~ later on on 7-26-12 noticed trauma to the inside of his cheeks (Doc 118 Ex. A page 11) and Dentist Jose Lopez noticed plaintiffs sharp fangs ~~an~~ and tried to file them down (Doc. 118 Ex. A at 19). (Doc. 68 at 23 Aherns Statements)

( ※ #84 should be part of section VII "of" this memorandum )

84. Dentist Murray's statement in Plaintiffs Dental record concerning "No Scarring of Mucosa or tissue noted (Doc 118 Ex A at 10) is Conclusory and his Affidavit (Doc. 130 Ex.F at 3-4) concerning scarring is Conclusory and not supported by facts. His Affidavit doesn't state : "If plaintiff chewed or bit his cheeks he would have scarring or scarring is a ~~clear~~ clear sign that ~~patient~~ Plaintiff bites the insides of his cheeks". Since the only thing noted by Murray in Plaintiffs

5-23-2011 dental Examination is "No Scarring" and Murray's Affidavit doesn't explain his medical approach as to why "No scarring" would lead him to conclude that Cosmetic Dental procedures would not be medically necessary. Plaintiff is Concerned with the 5-23-11 dental examination because the only thing noted is "Noticed no scarring". The Murray's Statement(Doc 130 Ex-F) that he didn't see any "lacerations, irritations or ulcerations" in plaintiff's mouth/ cheeks is not in the Dental record or supported by the Dental records only "No Scarring" (Compare Doc 118 Ex A at 10 "No scarring") to (Doc 130 Ex F at 3-4 "Murray's Affidavit") Murray's affidavit includes observations and analysis' that were not evidenced in the Dental record. Murray's Affidavit does not explain his Dental approach or methods as how he came to the Conclusion that the lack of Scarring Combined with biting lip or cheeks doesn't require Cosmetic dental procedures see Murray's Dental examination (Doc 118 Ex A at 10). Murray's Affidavit nor Dental records state wether his teeth are properly functioning.

85. Murray's Affidavit (Doc 130 Ex F at 3-4) and his May 23, 2011 Dental Examination clearly state Plaintiff has normal dentition (normally alligned teeth (Doc 118 Ex A at 10). But his prior examination of Plaintiff clearly states Plaintiffs teeth are Crowded (Doc 118 Ex A at 8 "Oral Pathology": Occlusion Crowding Max ant" Dated 10-12-2009) There is a Contradiction.

86. Murray's Affidavit and Dental records are Conclusory and do not explain the Dental Method or Approach in their conclusion as to why Plaintiffs doesn't need or require Braces or Cosmetic dental Procedures (Doc 130 Ex F) and (Doc 118 Ex A at 10). The Affidavit and Dental records

offer "NO" Dental/medical basis for concluding that plaintiff had no medical need for braces or Cosmetic Dental Restoration, or for their Conclusion that plaintiff's dental need wasn't serious and causing him pain, suffering and injuries. Or why ~~it would~~ be for cosmetic reasons only. He made No mention was Plaintiff in need of elective Dental Procedures to restore "function". (Doc. 130 Ex F)
*treatment*

## IX. Kansas Department of Corrections Policies and Procedures
### IMPP 10-115 & 10-116 (Plaintiff meets the criteria)

87. IMPP 10-115 I. (A)(i)(a)(b)(C) "All medical needs [shall] be attended to as quickly as possible. All medical needs are to be Considered serious unless the Condition: (a) Does not have a significant impact on the quality of the inmates life and health (See Affidavits of Witnesses/Inmate Witnesses (Doc. 119 pg 20-29)); (b) is not likely to worsen if not treated (Doc. 119 pg 20-29); (C) Does not cause intractable pain. (Doc 119 pg 20-29) (Doc 68 at 1-14)(Doc. 65)

88. IMPP 10-116 IV. (A)(B) ~~the~~ Dental procedures considered elective and not routinely provided: "Orthodontics". It doesn't say "never provided" only "not routinely provided". Plaintiff was told CCS "doesn't do procedures or allow procedures such as this". (Doc 118 Ex F. pg 3 Pryor's response)

89. IMPP 10-116 IV. (C): Dental treatment that falls outside of the professional capacity of the facility dentist [shall] be referred to an appropriate dental specialist upon approval of the Departmental Dental Authority (Doc 68 at 2 "Murray stated:" I can't do nothing for you, 'Your dental needs' treatment falls outside of my professional Capability")

90. IMPP 10-115 I.(A)(2)(d) Examples of of non-essential medical procedures include but [shall] not be limited to: Reparative/restorative or cosmetic surgery when the deformity does not affect function and existed prior to incarceration. Reparative/restorative surgery may be performed to improve [function] and [general Appearance] None of the Dental Records or Murray's affidavit do not even adress this although Plaintiff complained of ~~function~~ Improper function (Doc 68. at 2)(Doc 65)(Doc 118 Ex.F. 97-104

91. IMPP 10-115 I.(A)(2)(b) Examples of non-essential medical procedures include but [shall] not be limited to: "medical, pharmaceutical or cosmetic experiments". Plaintiffs remedy and relief is for his injuries sustained as a result of plaintiffs deliberate indifference to his serious dental; mental Health needs are/is covered by this policy. Cosmetic Dentistry, Medical Marijuana, ipod music etc. Plaintiff was shut out of Dental and mental Health services for months and forced to become life dependant upon this experimental forced self-treatment. (Doc. 68)(Doc. 65). The medical records and dental records show a big gap in time between treatment since plaintiff began trying to obtain dental treatment 5-23-11 to 7-26-12 (Doc 118 Ex A 10-11) and mental Health treatment from 2-7-2012 to 6-11-12 (Doc 118 Ex C pg 23-24). Also Murray's Statement that Plaintiffs procedure would be for "purely Cosmetic reasons" is contradicted by Dentist Ahern and Dentist Jose Lopez' Dental findings (Doc 130 Ex. F at 4;7 Dentist Murray's affidavit) (Doc 118 Ex. A at 11-14, and at 19 Ahern ; Lopez's findings Conflict with Murrays ~~testimony~~ statement that procedures would only be for cosmetic reasons

X. Controverted facts as they relate to Plaintiff's Mental Health records/Deliberate indifference to serious Mental Health Need. Mental Health records insufficient to support summary judgment

92. Plaintiff alleged facts that defendant Rex Pryor, Deere, was deliberately indifferent towards Plaintiff's serious mental Health needs (Doc 68 at 21-23). (Ex A attached Rex approved for plaintiff denial of mental Health treatment on Segregation Review Report) (Doc. 22), (Doc 119 at 24-29) (Doc 68 47)

93. Plaintiff was being treated for Body Dysmorphic Disorder (BDD) Before Pryor, Deere, denied him access to mental Health treatment. (Doc 118 Ex C at 3 "Dr. Leffingwell Assessed Plaintiff as meeting criteria for BDD, see the Assessment section.) Nor was Body Dysmorphic Disorder ruled out at all. No mental Health specialist ever stated Plaintiff did not have BDD (Doc 118 Ex C 1-60) (Doc 68 at 21, at 47) (Ex J attached) 118 Plast. Reconstr. surg. 167e, 174e "SEE EX J-3"

94. Body Dysmorphic Disorder is a serious Mental Health need. Canice Crerand, Body Dysmorphic Disorder and Cosmetic Surgery, supra note 60, at 170e (explaining that BDD tends to be continuous rather than episodic, and that severity of symptoms can fluctuate over the course of the disorder. Id at 170e (explaining most people with BDD do not seek treatment until their thirties, the mean age of full BDD onset is late adolesence). Id at 175e (explaining that 77% of persons with BDD have an "obsessive" preoccupation with a body part that rises to delusional levels and which may result in violence to others or do-it-yourself cosmetic procedures. In addition, a survey of cosmetic surgeons found that 2% had been physically threatened and 10% reported a threat of both

Violence and legal Action. ~~Supra note 60 at 171 374~~
9.

95. Crerand, supra not 60, at 171 e (explaining the receipt of minimally invasive [e.g. Collagen injections] and dental [eg. tooth whitening] procedures are also Common). Id at 170 e, 172 e (explaining that BDD cormobid psychopathologies include mood and anxiety disorders [75%], obsessive Compulsive spectrum disorder [ranging from 30-78%]. Substance abuse disorders [ranging from 25-30%], anorexia and bulimia [ranging from 7-14%] In addition, personality disorders are also Commonly present, such as avoidant personality disorder, paranoid, obsessive Compulsive disorder, and dependent personality disorders [at 57% for at least one]   (EX J)


96. Katherine A. Phillips et al., Suicidal Ideation and Suicide Attempts (Ex J) in Body Dysmorphic Disorder, 66 The J. of Clinical Psychiatry, 717, 721 (2005) Id at 720 - 722 (explaining that of 200 subjects with BDD, 78% reported a history of Suicidal Ideation. Of those subjects with a history of suicidal ideation, BDD was the primary reason 70.5% of the time. Of the entire sample BDD was the primary reason 55% of the time. Of That of the 200 Subjects with BDD, 27.5% had previously attempted Suicide. BDD was reported to be the primary reason for 36% of the samples 178 suicide attempts. Of those Subjects with a history of attempted suicide, 45.5% reported BDD as the primary reason for at least one attempt; and of the entire sample, BDD was the primary reason 12.5% of the time. The life time Suicide attempt rates in BDD are estimated 6 to 23 times higher than in the general US population, and the study's suicide attempt rate

during the 1 month before intake evaluation (3%) is an estimated 30 times higher than found in the US population. Treated subjects who had experienced suicidal ideation or attempt suicide often do not reveal their BDD symptoms to their treating clinician

97. Eva C. Ritvo et al., Psychiatric Conditions in Cosmetic Surgery Patients, 22 Facial Plastic. Surg. 194, 194 (2006) Supra note 53 at 194 studies show up to 47.7% of patients seeking a consultation for a cosmetic procedure meet the criteria for the disorder.

99. Rex Pryor was aware and Kyle Deere were aware of plaintiffs suicide attempts and or suicide Ideation and they could draw the inference that Plaintiff had a serious mental Health need and failed to take corrective measures (Doc 68 at 21-22, and at 47). The alleged dates in the sworn Complaint regarding their encounters with plaintiff coincide with the lapse of time in which plaintiff did not have or get access to medical services or mental health services (Doc 118 Ex C at 23 - 24 Mental Health record 2-7-12 was the last date plaintiff was allowed mental health services he was shut out until 6-11-@2012 The Defendants encounters fell in between those dates showing that plaintiff was denied mental health treatment (Doc 68 at 21-22 and at 47)(Doc 118 Ex Ex C at 23-24).

100. Plaintiffs injuries still remain as far as mental Health goes and Elective Dental Procedures go. The mental Health records do not medically explain away Plaintiffs claims (Doc 118)

The records do not address none of plaintiffs insuries caused by defendants (Doc 118-3)

101. The entire Mental Health record is ~~conclusive~~ Conclusory and not Supported by facts. (Doc 118 Ex C 1-60). No mental Health specialist ever determined with mental health certainty that plaintiff did not have a serious mental Health need for cosmetic dental procedures. There are no ~~reason~~ Mental health statements offering any scientific, mental Health basis for concluding that Plaintiff had no mental Health need for cosmetic dental procedures. At no time did any mental Health professional offer any statements in affidavit form or In plaintiffs mental health records show or explain how they arrived at to their Conclusions that plaintiff did not need elective dental procedures (Doc.118-3 Mental Health records) The records do not address his sideaffects or mental Health writings

#102. At no time did a mental Health professional offer any statements in affidavit form or in Plaintiffs Mental Health records regarding how they came to the Conclusion that Plaintiff did not need medical marijuana to treat his BDD (Doc 118-3 mental Health records)

103. At no time did a mental Health professional develop a mental Health plan to cure plaintiffs preoccupation/addictions to Marijuana, music; XXX Sexually explicit material ~~ate~~ (Doc 118-3 mental Health record). Nor did they offer any explanation as to why I was and still preoccupied and addicted to this self-treatment protocol (Doc 118-3) and why Plaintiff felt this experimental treatment was working (Doc 118-3) Nor did any mental Health specialist offer any medical explanation about plaintiffs violence resulting in DR's, Homosexuality, suicide Disciplinary Reports Hempts; Ideation, Marijuana use; its link to BDD and treatment for these side affects Nothing (Doc 118-3)

104. There is no explanation as how this alleged treatment plan for Plaintiff's BDD was going to work and how this treatment plan would stop Plaintiff from obsessing over his teeth marijuana, MP3 music and sexually explicit material and Plaintiffs claims of Allegations (Doc.68)(Doc.118-3) ^all of

105. The mental Health records are conclusory and without specific supporting facts to address all of plaintiffs problems and how it would help or treat or cure him (Doc.118-3)

XI. Controverted Facts as they relate to Personal Injury Claims and Exhaustion of Administrative Remedies (IMPP 01-118)(KAR 44-15-201)

106. The Personal Injury Claims are available for "Neglegence Claims". The form and policy only allow for recovery or reimbursement if the official is "Neglegent" (See Ex.E & F attached)(KSA 46-920(a))

107. KSA -920 (a) allows for reimbursem. for damages or loss if the Secretary determines + was caused by "Neglegence" of the State, agency or officer or employee. IMPP 01-118 and KSA 46920(a) is reserved for Medical "Neglegence" not Deliberate Indifference" (Ex.E & F)

108. The Form doesn't notify a prisoner that he can claim "Deliberate Indifference" on it. (Ex.E)."Neglegence" doesn't rise to the level of "Deliberate Indifference" in an 8th Amendment Claim for Deliberate Indifference. Plaintiff doesn't have a neglegence Claim only Deliberate Indifference

109. Plaintiff clearly had a Special Kind of problem under KAR 44-15-201 so Plaintiff Properly Exhausted his Administrative Remedies under KAR 44-15-201 "Special Kinds of Problems" (Doc. 119 pg 40)(Doc. 119 pg 36-39)(Doc. 83 pg 62 "Bottom right - Corner, CC: Sec of Corrections via KAR 44-15-201), (Doc. 97)(Doc. 65)

110. Plaintiff had a special Kind of problem that he properly exhausted under KAR 44-15-201 "Special Kinds of Problems" Because: (1) Plaintiff's grievances and letters were requesting reimbursement for injuries that were caused by of the officials' deliberate indifference", and IMPP 01-118 ½ KSA 46-920(3) only reimburse for injuries caused by the official's Negligence. (Doc. 68 pg 3-11)(Doc. 65)(Doc. 118 Ex. F ; G). (2) Plaintiff Substantially Complied with KAR 44-15-201 because he "addressed as official mail a sealed letter/grievance report form to the Secretary of Corrections ; or Warden. (Doc. 68 pg 3-11)(Doc. 65)(Doc. 118 Ex F ; G)(Doc. 83 pg 62)(Doc. 97). (3). Plaintiff had a very complex problem because: Personal Injury claims do not reimburse for injury caused by deliberate Indifference; Plaintiff was requesting relief in the form of Cosmetic Dental procedures; Medical Marijuana, XXX material, MP3 music, Damages over 500,000 ; Plaintiff is claiming that the Defendants didn't "Cause" the Dental Condition but "Prolonged" the pain suffering and agony of the non Serious Dental Condition and Personal Injurie claims - prisoner has to show the official is the "Cause of" the Dental Problem. of injuries (4) Plaintiff exhausted his remedies before the months before the 10th Cir. Court of Appealls 3 Dist. Crt even notified the Defendants that there was a lawsuit pending and before the Defendants were ordered to respond. (Doc 65)(Doc. 83 pg 62)(Doc. 97)(Doc 118 Ex F-G) (Doc. 84) (Doc.92)(Doc. 66). (5) The Plaintiff had an on going issue that lasted almost two years dealing with Defendants deliberate indifference to his Serious Dental and Mental Health needs and the "length of Denial" is an element that plaintiff is using towards

Defendants Culpability and Damages. The Constitutional Deprivation the Defendants are involved in lasted almost 2 years (Doc.68)(Doc.65)(Doc.83)/and KAR 44-15-201 doesn't Contain any time limitations or deadlines to send your grievance and it allows the plaintiff to bypass the grievance procedures under KAR 44-15-101.

111. The Defendants Affidavits/and or Mr. Burrs' and Mr. Ross' Affidavits never mention plaintiffs exhausted grievance under KAR 44-15-20 (Doc 130 Ex G-H). Also plaintiff never received a response back from the Secretary stating that plaintiffs grievance was untimely; that plaintiff should pursue a neglegent or personal injury claim instead of this grievance. (Doc 97) Or that plaintiff should pursue these issues under the regular grievance system Under KAR 44-15-101 nor exhaust that grievance to a higher Authority. (Doc.83 pg 62)(Doc.97)(Doc.65)

12. The Defendants failed to satisfy their initial Burden. They failed to show that ~~the plaintiffs Cost Recover~~ policy/Personal Injury Claim policies allowed reimbursement for injuries Caused by "Deliberate Indifference" and that it has the jurisdiction to reimburse for deliberate indifference"(Doc 130 Ex.G-H). Defendants failed to show that Plaintiff did not exhaust his administrative remedies under KAR 44-15-201. (Doc.83 pg 62) (Doc.97)(Doc.65)(Doc 68 pg 341). The Defendants failed to show that 44-16-104 was available for the exhaustion of Deliberate Indifference claims. The facts and evidence create a genuine factual dispute for trial. KSA 46-920(a) ; IMPP 01-118 are not available to plaintiff to exhaust his Deliberate Indifference claims only Neglegence Claims. If plaintiff was filing ~~state~~ State Neglegence claims then defendants would have a valid point. Plaintiff properly exhausted his claims under KAR 44-15-201.

# XII. Controverted Facts as they relate to Defendants Claims of Entitlement to Eleventh Amendment Immunity for Plaintiffs money damages against them In Their Official Capacities. (Ex Parte Young Exception)

"Individual Capacity - Damages"   "Official Capacity - Injunctive Relief"

113.   The Ex Parte Young doctrine enables a plaintiff to circumvent the Eleventh Amendment (Muskogee Creek Nation v. Pruitt 669 F.3d 1159). In determining whether plaintiffs seek prospective injunctive relief, the Court must examine the Complaint to see whether it gives "any indication" that plaintiff might be entitled to or requesting prospective injunctive relief (Muskogee Creek Nation 669 F.3d 1159)

114. (1). Plaintiff has clearly requested or is suing state officials rather than the state itself, (2). Plaintiff has alleged an ongoing violation of Federal law and (3). Plaintiff has been/is seeking prospective relief. (Doc. 68 allegations 3 remedy & relief). The Ex Parte Young exception applies to this case. (Muskogee Creek Nation 669 F.3d 1159)

115.   Plaintiff also wants to point out to the Court and the defendants that the Court approved §1983 forms do not include a section in which it gives the option of which capacity each defendant is being sued in and for what specific relief. (Doc. 68 Approved §1983 form)

116. Plaintiff was Concerned and inquired about the lack of notice to the prisoner on which Capacity he can Sue and for what relief because the Court Approved forms do not give you an option or Notice on the Individual's official Capacity inquiry. He wrote the Court trying to bring this to the attention of the Clerk and Court (DOC .83 Cover letter to the Clerk inquring into the official Capacity & Individual Capacity.) That Cover letter states: "The Complaint form never specified or asked me what [Capacity] I I wanted to Sue the defendants in [Individual or official]? Do I write which Capacity or does the Judge make that the decision?" This Cover letter is in front of and attached to (Doc .83) (dated 2-11-13 Way before Proceedings began)

117.  Plaintiff also clarified and Corrected and Notified Defendants & Court which capacity the defendants were being Sued in and for what specific relief (Doc .127 Motion to Correct a mistake in the 1st Amended Complaint.)

118. The Plaintiff notified the Defendants and the Court that He was Suing the Defendants in their "Individual Capacities for Damages", and that He was Suing the Defendants in their Official Capacities for Injunctive Relief" (Doc .127)

19. The Ex Parte Exception applies. Also Plaintiff is still entitled to money Damages from their Individual Capacities and he is entitled to Injunctive Relief From their official Capacities (Doc .127). Plaintiff "Never" intended to See Seek damages in their official Capacities.

## Issues Rebutted By this Memorandum

I. There are genuine issues in dispute regarding defendants "Personal
   " Participation" and their Claims of "Qualified Immunity" pertaining to
   their involvement in the Constitutional Deprivation (I - IV).

II. Plaintiff exhausted his Claims under KAR 44-15-201 because
   The Personal Injury Claims only reimburse for injuries Caused by
   " Neglegence", and Plaintiff was seeking Compensation for his injuries
   that were caused by Defendants " Deliberate Indifference". (XI).

III. Plaintiff notified the Defendants and Court that he was Suing Defendants
   in their "Individual Capacities for Damages," and that he was Suing
   Defendants in their "Official Capacities for Injunctive Relief." Plaintiff
   also pointed out that the Ex Parte Young exception applies to this Case.
   (XII).

IV. Dentist Keith Murray's Affidavit is insufficient to support ^defendants Summary
   Judgment, ~~and~~ ~~then~~ & His Affidavit is Conclusory without specific
   supporting facts as ~~how~~ to how ~~he~~ he medically reached the Conclusion
   Plaintiff didn't need Cosmetic dental procedures. Nor does his
   affidavit address the ^totality ~~totality~~ of Plaintiff's allegations of serious
   Dental problems in his Complaint & Informal Resolutions. And his
   dental findings Conflict with other dentists findings and his own
   findings. (VI - VII). & (VIII)

V. The Dental Records presented by Defendants are insufficient to Support Summary Judgment for Defendants. There is not one piece of Dental Record stating that a Dentist wrote, recorded or inferred that Cosmetic Dental Restoration or Braces were not needed or innappropriate nor is it evidenced in the Dental record that there is any Dental basis for concluding that Cosmetic Dental Restoration or braces were not medically necessary. The Dental Records are Conclusory and not supported by specific facts. (VII - VIII); (VI)

VI. The Mental Health Records verify that Plaintiff has a Serious Mental Disorder (Body Dysmorphic Disorder) Known as BDD and was being treated for BDD. The Record/complaint showed that Rex Pryor and Kyle Deere were aware of the symptoms he displayed Suicidal ideation, obsession over body (teeth) suicide attempts, Drug abuse, violence etc. and failed to take Corrective Action and shut him out of Medical Services. (X)(I)(II) (IMPP 10-105)

VIII. The Mental Health Records are insufficient to Support Summary Judgment. The record is conclusory and not supported by facts. The record doesn't even explain the treatment nor how it will treat all the symptoms alleged in the Complaint. The record doesn't contain any medical basis that lead them to their Conclusion that cosmetic Dental procedures

Would not help or not needed or how all the other symptoms alleged and shown in the Complaint; Informal Resolutions are related or not related to BDD and how they will treat these inquiries or symptoms. The record contains no medical basis or conclusions that Plaintiff did not need Marijuana, MP3 music, XXX materials and Why he became mentally dependent upon them to treat his BDD and how they will get him off this stuff. Plaintiff still suffers from his BDD without these things. Plaintiffs mental problems are still not treated and The Remedy & Relief he request is still relevant and necessary

IX. Plaintiff has alleged Causation in his Complaint
(DOC. 68 at 18-20) (DOC. 68 at 21-22)(DOC. 68 at 40-42)
(DOC 68 at 43-47)(DOC. 68 at ) (DOC. 68 at 12-13)
See Affidavits of Inmate Witness (DOC. 119 pg 20-28)

## Conclusion

Defendants are "NOT" entitled to Judgment as a matter of law because the are genuine issues of material fact in dispute regarding Defendant's claims of Plaintiff's failure to exhaust all "available" administrative remedies and Defendants claims of Entitlement to qualified immunity. In addition, this Court should "NOT" grant Summary Judgment because Defendants are "NOT" entitled to sovereign immunity for claims for injunctive relief in their official Capacities and Claims for Damages in their Individual Capacities. For these reasons and more as defined in the Memorandum in Opposition, to Summary Judgement, Plaintiff respectfully request the Court good to deny Defendants Motion for Summary Judgment. and proceed to trial.

## Affidavit of Truth of Memorandum

I, Anthony Conley, Pro se Swear under the penalty of purjury that All the facts in this memorandum and memorandum itself, All the exhibits attached to this memorandum, All the documents this memorandum makes reference to are the truth the whole truth and nothing but the truth so help me God. I have personal-first-hand Knowledge of the facts therin and I'm competent to testify and will testify to the truth of these matters. pursuant to KSA 21-3805, 28 USC § 1746, 18 USC §§ 1621, 1623

_Anthony Conley_

Executed on- 4-10-14 (Thur)         Anthony Conley #60437, pro se, Affiant

                                    EDCF

                                    P.o. Box 311

                                    El Dorado, Kansas 67042

Respectfully Submitted

Anthony Conley #60437

EDCF

P.O. Box 311

El Dorado, Kansas 67042


## Certificate of Service

This is to certify that a copy of the above foregoing Memorandum in opposition to Defendants Motion for Summary Judgment was filed with the Court via the CM/EDCF system and a copy w/Exhibits was served on the Defendants by depositing the same in the U.S. Mail first class postage prepaid, this 9th day April, 2014, addressed as follows:

Whitney L. Casement, No. 25466

Assistant Attorney General

120 SW 10th Ave., 2nd Floor

Topeka, Kansas 66612

# Affidavit Supporting Exhibits

I, Anthony Conley, pro se swears to under the penalty of perjury the following. All of the exhibits attached to this memorandum.are true and correct and Complete. They are KDOC Institutional Documents and are apart of the KDOC and Court records. These exhibits are not indended to mislead or delay the proceedings, The Medical Documentation Concerning BDD (Body Dysmorphic Disorder) were retreived off of the KDOC Lexus Nexus Search engine. These Documents Are the truth, the whole truth and nothing but the truth so help me God. pursuant to KSA 21-3805, 28 USC § 1746, 18 USC §§ 621, 1623.

Executed on: 4-10-14 (Thur)

Anthony Conley Pro se, Affiant
EDCF
P.O. Box 311
El Dorado, Kansas 67042

Exhibits A - J

## KANSAS DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE SEGREGATION REVIEW (PURSUANT TO IMPP 20-105/106)

C-SEG

XXInitial            Weekly            Monthly

Name: Conley, Anthony                Number: 60437        Date: 02/09/12

Date placed in segregation: 02/07/12        Recommended date of release: N/A

Did inmate appear before board? No

1.   Present Status: IMPP 20-104 (4) Pre-Hearing Detention

2.   Return to General Population?
     Yes            XXNo

3.   Transfer to another Kansas facility or another State or Federal facility?
     Yes            XXNo

4.   Medical or Psychological intervention?
     Yes            XXNo

5.   Continue XX        Modify        program or treatment status?

*Rex Pryor has been on Actual notice since the beginning but never ordered any medical or Psychological intervention knowing I assaulted an officer! He knew the effects of non-treatment months prior but no help?*

6.   Inmate informed of right to submit written request for release to board?
     XXYes            No

7.   While in segregation inmate's behavior has been satisfactory?
     XXYes            No

8.   The placement was legal and proper?
     XXYes            No

9.   A pre-segregation placement hearing was held?
     XXYes            No

10.  Board Comments: Inmate was placed in segregation prehearing detention. Inmate refused to see the board. The board agreed he should remain in seg until the disciplinary process has been completed.

Approved: ✓        Disapproved:
                                        EAI Staff
Approved: ✓        Disapproved:
                                        Clinical Staff
Approved: ✓        Disapproved:
                                        Security Staff
Approved:          Disapproved:
                                        Chairperson              Rex Pryor
Approved: ✓        Disapproved:
                                        Warden

Inmate acknowledgement
I received a copy of this review on: Feb 10   20 12 At 3:30 pm

                                        Inmate signature and number
                                        CCIIW- Sehnew
                                        Signature and Title of Staff

[ Ex. A ]



P-1528

Attachment G, IMPP 11-119
Effective: 07/2007

# DISCIPLINARY REPORT

L.C.F.-Central
( FACILITY)

| Case No. 34417 | Date of Alleged Violation: 07 FEB 12 | APPX Time: 1640  A.M. / P.M. |

| Date This Report Written: | 07 FEB 12 | Time: 1800  A.M. / P.M. |

Name of Inmate: CONLEY     ANTHONY     D.   No. 60437   Cell No: C-207
LAST          FIRST        MI

Duty Assignment:  Pre Hearing Detention

**Alleged Violation of Law or Rule** (Identify by Code No., Short Title, and Class) 44-12-304  DISOBEYING
ORDERS  CLASS I   44-12-301  FIGHTING  CLASS I

**FACTS:** ON 07 FEB 12 AT APPROXIMATELY 1640 HOURS I TOLD I/M CONLEY 60437, THAT PER THE
CAPTAIN, SINCE HE WAS NOT ON THE CALL OUT WE COULD NOT LET HIM GO TO HIS DOWNFALL
COLLEGE CALLOUT IN THE MEDIUM.  I/M CONLEY BECAME BELLIGERANT AND SAID IT WAS
BULLSHIT. I ORDERED I/M CONLEY TO GO TO HIS CELL AND LOCK UP. I/M CONLEY SAID I
AM NOT LOCKING UP UNTIL I SPEAK TO THE CAPTAIN. I TOLD CONLEY AGAIN TO LOCK
UP. I WOULD CALL THE CAPTAIN AFTER MASS MOVEMENT. I/M CONLEY STILL REFUSED.
I ORDERED ONE MORE TIME TO LOCK UP IN HIS CELL AND I/M CONLEY STILL REFUSED. I
CALLED A REFUSAL TO LOCK UP. SHAKEDOWN RESPONDED AND I/M CONLEY REFUSED TO
CUFF UP AND BEGAN TO ACTIVELY RESIST SHAKEDOWN SO I HIT MY BODY ALARM AND
BEGAN TO ASSIST IN SUBDUING AND CUFFING I/M CONLEY.  — EOR —————/

(Attach Additional Sheet(s) if necessary)
Staff Witnesses: COI GULC, COI MOORE   (Signature)
COI ABBOTT (ALL SD OFFICERS)
                                        COI S.D. KNOWLES 2-10  5/5
                                        Printed Name and Title of Employee Writing Report

                              Approved by:
                                        (Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.*

Executed on 07 FEB 12          Signature

| I received a copy of this report on 2-7-12 , 2030 , Refused Login (see Log) |
|  (Date)   (Time)   (Inmate Signature & No) |
| I served a copy of this report  2-17-12 , 2030 , Col |
|  (Date)   (Time)   (Signature of Officer or Unit Team Manager & Title) |

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*



Ex. B

P-1528

Attachment G, IMPP 11-119
Effective: 07/2007

# DISCIPLINARY REPORT

LCF-C
( FACILITY)

| Case No. 2001 | Date of Alleged Violation: 10-25-11 | Time: 1655 A.M. / P.M. |
|---|---|---|
| Date This Report Written: | 10-25-11 | Time: 2107 A.M. / P.M. |

Name of Inmate: Conley    Anthony    D.    No. 60497    Cell No: B116
                 LAST      FIRST      MI

Duty Assignment:    UAA

Alleged Violation of Law or Rule (Identify by Code No., Short Title, and Class) 44-12-317 Misuse of
Handling of Authorized or Prescribed Medication class I ; 44-12-203
Theft Cla... I

FACTS: On the above date and approximate time R/o and COI B. Martin
Searched B116, which is assigned to I/m Conley. They found a KOP
card of Acetaminophen which had the top part torn off, with the top
part missing, there is no way to identify who the KOP card was issued to, they
also found four canteen bags that do not belong to I/m Conley, a bundle of
individually wrapped stamps, a paper strip with the number of I/m watson
90938, who was returned on 6-9-10, and a water bottle from USDB Vocational
Training Sales More. None of these items were issued to or purchased by
I/m Conley. The KOP card and stolen items were tagged and sent to evidence.

Staff Witnesses: COI B. Martin    (Attach Additional Sheet(s) if necessary)       1400-2200  575
                 1400-2700   w+Th    (Signature)

                                     Printed Name and Title of Employee Writing Report

                          Approved by: _____

                                     (Shift Supervisor, Unit Team Manager & Title)

                                                        I need help.

I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.   Please talk to
                                                                                     mental Health
Executed on  10-25-11 _____         Signature  CSI J.M.R           Dr. leffingwell
                                                                                     Condition

I received a copy of this report on 10-25 , 9:44pm, _____  is causing my
                                    (Date)   (Time)      (Inmate Signature & No)   bad behavior
I served a copy of this report 10-25-11 , 2444 , COI W-
                                    (Date)   (Time)      (Signature of Officer or Unit Team Manager & Title)

Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial
prejudice to the inmate, which is the burden of the inmate to provide. Pursuant to K.A.R. 44-13-707. Harmless error; Plain error.

B-2

P-1528

Attachment G, IMPP 11-119
Effective: 07/2007

# DISCIPLINARY REPORT

_LCF-C_
( FACILITY)

| Case No. 4975 | Date of Alleged Violation: 10-24-11 | Approx Time: 1844 A.M. / P.M. |
| Date This Report Written: | 10-24-11 | Time: 1917 A.M. / P.M. |

Name of Inmate: Conley     Anthony     D     No. 60-437  Cell No: B116
                   LAST        FIRST      MI

Duty Assignment: _____ uAA

**Alleged Violation of Law or Rule** (_Identify by Code No., Short Title, and Class_) 44-12-1007  Violation of
Published orders - Living Unit Rule 21  class II ; 44-12-304  Disobeying
Orders  class I

FACTS: On the above date and approximate time R/o was performing
a security check and saw I/m Conley in B116 stick his mirror out of
his cell bars to look down the run. R/o ordered I/m Conley to surrender the
mirror and as I/m conley asked if he would get it back, R/o told him it would
be confiscated. I/m Conley then told R/o he would not surrender the mirror.
R/o ordered I/m Conley twice more to surrender the mirror. I/m Conley refused
both orders. On 10-24-11 I/m Conley was issued a DR for sticking his mirror
out and refusing to give it to the officer.

(Attach Additional Sheet(s) if necessary)

Staff Witnesses: _____ (Signature) _CTI J.Welch_ 1400-2200 5+5
                                                  CTI J. Welch
                                      Printed Name and Title of Employee Writing Report

Approved by: _____
(Shift Supervisor, Unit Team Manager & Title)

_I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct._

Executed on   10-24-11          Signature   CTI J.W

HELP! His
Mental treatment
need medical Treatment

I received a copy of this report on 10-24-11, 21:50, Anthony D. Conley  Duress/coercion
                                        (Date)     (Time)        (Inmate Signature & No)

I served a copy of this report   10-24-11, 21:50, COI W. Mason
                                (Date)     (Time)      (Signature of Officer or Unit Team Manager & Title)

_Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error._

B-3



P-1528

Attachment G, IMPP 11-119
Effective: 07/2007

## DISCIPLINARY REPORT

I CF-C
( FACILITY )

| | | |
|---|---|---|
| Case No. 5663 | Date of Alleged Violation: 6-1-12 | Time: 0827 A.M./P.M. |
| Date This Report Written: 6-1-12 | | Time: 0840 A.M./P.M. |

Name of Inmate: Conley   Anthony   No. 60437   Cell No: B-135
LAST   FIRST   MI

Duty Assignment:_____

Alleged Violation of Law or Rule *(Identify by Code No., Short Title, and Class)* 44-12-312   D-1
use of Stimulals   Class II

FACTS: On 6-1-12 at approximately 0827 Inmate Conley #60437 refused
to Submit to a Urine Analysis test and admitted verbally and in writing
Marijuana use.   E O R

(Attach Additional Sheet(s) if necessary)

Staff Witnesses: CoI Freeman   (Signature) CoI _____
CoII Helm   CoI Schiller
CoI Day   Printed Name and Title of Employee Writing Report

Approved by: CSII Don East
(Shift Supervisor, Unit Team Manager & Title)

*I declare (or verify, certify or state) under penalty of perjury that the foregoing is true and correct.*

Executed on 6-1-12   Signature _____ I gotta have to heal cure treat

Using Marijuana to treat illness  I needs need dental & mental treatment

I received a copy of this report on 6-1-12 , 9:52am   Anthony Conley need dental & mental treatment
(Date)   (Time) APPROX.   (Inmate Signature & No)

I served a copy of this report 06/01/12 , 1000 , _____
(Date)   (Time)   (Signature of Officer or Unit Team Manager & Title)

*Technical and clerical errors in the writing and / or processing of the Disciplinary report shall not be grounds for dismissal, unless there is substantial prejudice to the inmate, which is the burden of the inmate to provide. Pursuit to K.A.R. 44-13-707. Harmless error; Plain error.*



Ex. B-4



## KANSAS DEPARTMENT OF CORRECTIONS
### DISCIPLINARY OFFICE
**INMATE DISCIPLINARY SUMMONS**

TO: _Conley    60437_          DATE: _6/4/12_
     **INMATE NAME**     **NUMBER**

HOUSING UNIT/CELL: _B 135_

CASE NO. _5663_

---

YOU ARE HEREBY SUMMONED TO APPEAR BEFORE A HEARING OFFICER AS DEFENDANT IN THE ABOVE REFERENCED CASE.

    TIME: _8:00 OR when called_

    DATE: _6/6/12_

    LOCATION: _MAX Hrg Rm_

**FAILURE TO REPORT WILL RESULT IN THE ISSUANCE OF A DISCIPLINARY REPORT FOR THE VIOLATION OF K.A.R. 44-12-501; A CLASS III OFFENSE.**

---

INMATE SIGNATURE: _Conley Cone_ (need dental/mental treatment)

STAFF SIGNATURE: _CSI Silva_

SERVED: _6/4/12_ _1900_
       **DATE**      **TIME**

---

PLEASE RETURN ORIGINAL SUMMONS TO THE DISCIPLINARY ADMINISTRATOR'S OFFICE. GIVE THE INMATE THE COPY FOR HIS RECORDS.

8

Ex. B-5



LCF-26

**KANSAS DEPARTMENT OF CORRECTIONS**
**INTERDEPARTMENTAL MEMORANDUM**
A Safer Kansas Through Effective Correctional Services

**DATE:**     February 9, 2012

**TO:**        Conley, Anthony # 60437 C-207

**FROM:**     Kyle Deere, Deputy Warden of Programs

**SUBJECT:**  Disciplinary Report # 3150    Possession of Marijuana

You received the above disciplinary report for dangerous contraband. This is your
second offense within a twelve month period.  Therefore your visits will be suspended
for six months until **8-9-2012.**  You may apply for reinstatement at the end of the
suspension. It is your responsibility to notify your visitors.


cc: Imaging
    File



# KANSAS DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE SEGREGATION REPORT

To: SECRETARY OF CORRECTIONS
From: Lansing Correctional Facility- CU

Report No.: 1088
Date this Report Filed: 02/25/2013
Date Placed in Administrative Segregation: 10/30/2012
Reason for Segregation:
IMPP 20-104 1B (13) Other Security Risk

Inmate: Conley, Anthony
Inmate No.: 60437
Moved from Cell No.: C-118
To Segregation Cell No. : C-118

Facts:  Inmate Conley 60437 began his KDOC incarceration on 03/12/1998 for the charge of murder in the first degree. Inmate Conley has been housed in segregation since 10/30/2012. Inmate was originally placed in segregation for being found with a shank in his cell during a routine shake down of the cell. During his stay in the segregation unit inmate Conley has continued to be a behavioral issue accumulating eight disciplinary reports, with fourteen different charges that include; assault, battery, disruptive behavior, misuse of state property, disobeying orders x2, insubordination and disrespect, interference with restraints, and lewd acts x6. Inmate Conley's behavior continues to escalate towards staff and he has become more sexually charged with his comments and requests. Along with having been charged with six lewd act charges he continues to submit requests for sexually explicit materials along with illegal drugs. Inmate Conley has been seen by mental health and evaluated on numerous occasions during his stay in segregation and the mental health staff have not noted any medical or mental health issue that would lead one to believe his actions are anything other than behavioral. Inmate Conley's blatant disregard for facility rules and regulations as well as the increasing severity of the charges that he has obtained, it is the request of the Segregation Review Board that this inmate be placed on Other Security Risk status and transferred to EDCF.

_____
(Signature and title of reporting Officer)

____ Pre-segregation hearing conducted.
XX Pre-segregation hearing not conducted. (Explain) _Currently in Segregation_

Approved by: _____
(Signature and Title of Reporting Officer)

Warden Authorization (If Needed): _____

INMATE ACKNOWLEDGEMENT:

I received a copy of this report on _____, 20__ @ _____
(Inmate Signature & Number)

_____
(Signature of Officer & Title)

cc: Imagining
    Warden
    Inmate
    Unit Team
    Central Office File

Ex. D

## PROPERTY DAMAGE/LOSS OR PERSONAL INJURY CLAIM FORM

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* **Section I** \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Facility Filed At: Facility No. _____ Facility Initials _____
    (Refer to PLC coding manual for facility no. & initials)

Facility Filed Against: Facility No. _____ Facility Initials _____
    (Refer to PLC coding manual for facility no. & initials)

Type of Claim: (circle one)   01-Lost Property    02-Damaged Property  03-Injury

Amount of Claim: _____ Date of Loss Damage, or Injury:(MO/DAY/YR)_____ _____ _____

Name of Claimant: (Last, First, MI) _____

KS OBSCIS No. & Suffix: (if applicable) _____

Where Loss Damage or Injury Occurred:
If occurred in cellhouse, enter cellhouse/room number: _____

Otherwise circle one of the following:     901-Mailroom     902-R&D   903-Central Property
                                904-Laundry     999-Other Location

NATURE OF CLAIM: (Set forth detailed facts including date of loss, damage or injury, how it occurred, place of occurrence, how you claim institution or employee was negligent, and amount of the claim.)

_____
                      Signature of Claimant

Subscribed and sworn to before me this _____ day of _____, 20___ .

My Commission Expires: _____

_____
                      Notary Public

Received from Inmate/Claimant: _____ _____ _____ _____
                     Date   Time   UT Signature          Inmate Initials

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* **Section II** \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Date Received by Warden: (MO/DAY/YR) _____ _____ _____

Facility Log No. Assigned: _____
Investigation Report:

Date: (MO/DAY/YR) _____ _____ _____ _____
                                 UT Member or Investigator Signature

Ex. E

**K.S.A. § 46-920**  (Copy w/ Cite)                    Pages: **2**

*K.S.A. § 46-920*

LexisNexis (R) KANSAS ANNOTATED STATUTES        ◆**Practitioner's Toolbox**     

\*\*\* This document is current through the 2012 Supplement \*\*\*        ↥ History
\*\*\* Annotations current through June 10, 2013 \*\*\*

Chapter 46. LEGISLATURE
Article 9. CLAIMS AGAINST THE STATE

GO TO KANSAS STATUTES ARCHIVE DIRECTORY

K.S.A. § **46-920** (2012)

**46-920. Claims against the state; payment by secretary of corrections of certain personal injuries and
personal property losses of inmates authorized; limitation; setoff of moneys received by inmates for
court ordered restitution.**



(a) The secretary of corrections may reimburse any inmate of any correctional institution or other facility under
the secretary's jurisdiction for any personal injury or personal property damage or loss occurring under
circumstances which establish, in the secretary's opinion, that such loss or damage was caused by the negligence
of the state or any agency, officer or employee thereof. No reimbursement payment shall be made on any claim for
an amount of more than $ 500. Nothing in this section shall prohibit the crediting of any payment made to an
inmate of a correctional institution or other facility under the secretary's jurisdiction to such inmate's account within
the institution or facility, as the case may be.

(b) When an inmate owes an outstanding unpaid amount of restitution ordered by a court pursuant to K.S.A.
21-4603, 21-4603d or 21-4610, prior to their repeal, or K.S.A. 2012 Supp. 21-6604, 21-6607 or 21-6702, and
amendments thereto, the secretary of corrections shall withdraw from the inmate's trust account as a set-off:

(1) Money received by the inmate from the state as a settlement of a claim against the state through the joint
committee on special claims against the state which is otherwise specifically approved for payment by
appropriation act of the legislature, or which is approved through the department of corrections internal claims
procedure under this section; or

(2) money received by the inmate from the state as the result of a settlement or a final judgment in a civil action in
which the state of Kansas or an employee of the department of corrections was a named defendant and the state
was found to be liable.

(c) When an inmate on post release, parole or conditional release supervision owes an outstanding unpaid amount
of restitution ordered by a court pursuant to K.S.A. 21-4603, 21-4603d or 21-4610, prior to their repeal, or K.S.A.
2012 Supp. 21-6604, 21-6607 or 21-6702, and amendments thereto, the state shall setoff the unpaid restitution
from:

(1) Money payable to the inmate from the state as a settlement of a claim against the state through the joint
committee against the state which is specifically approved for payment by appropriation act of the legislature or
which is approved through the department of corrections under this section; or

(2) money payable to the inmate from the state as a result of a settlement or final judgment in a civil action in
which the state of Kansas or an employee of the department of corrections was a named defendant and the state

Conley




# KASPER INTERNAL KDOC - OFFENDER POPULATION SEARCH

### Kansas Adult Supervised Population Electronic Repository
### Kansas Criminal Justice Information System



## OFFENDERS SHALL NOT BE ARRESTED SOLELY ON THE BASIS OF INFORMATION DISPLAYED ON THIS SITE

**CONLEY, ANTHONY D,** (KDOC # 0060437)

**This Information is Current as of: Feb 18 2014 5:00AM**

## Name(s)

| Name Type | Name |
|---|---|
| Conviction | CONLEY, ANTHONY D |
| True | CONLEY, ANTHONY DEAN |

## Identification

| KDOC# | SIDNum | FBINum |
|---|---|---|
| 0060437 | 758978 | 978806AB1 |

## Birthdate(s)

| Birthdate Type | Birthdate | Age |
|---|---|---|
| True | Oct 14, 1976 | 37 |

## Demographics

| Eye Color | Hair Color | Height | Weight | Gender | Race |
|---|---|---|---|---|---|
| Brown | Black | 5'-10" | 188 | Male | Black |

CONLEY, ANTHONY D
Approx Picture Date
2012-06-27

CONLEY, ANTHONY D
Approx Picture Date
2012-06-27

## Current Status reported by Dept. of Corrections

| Earliest Possible Release Date (1) | Current Status | Admission Date | Current Location (2) | Custody Level |
|---|---|---|---|---|
| Mar 12, 2038 | Incarcerated | May 07, 2004 | El Dorado CF-Central | Special Management |

**(1) This date could be affected by a parole board decision or good time and/or program credit.**
**(2) Click on Location for the Facility web site.**

| Offender Documents |

## Conviction(s)

| County | Case Number (I) | Offense Date | Sentencing Date | ACS | Criminal Conviction Description | Counts | Crime Severity Level | Case Status (II) | State |
|---|---|---|---|---|---|---|---|---|---|
| Sedgwick | 97CR2225 | Sep 26, 1995 | Sep 17, 1998 | N/A | Murder in the First Degree | 1 | Off Grid | Active | KS |

**(I) If Number includes JV : Extended juvenile jurisdiction adjudications with adult prison sentences stayed, then imposed.**

Ex. G
EX. pt 1

| Sep 16, 2011 | 1 | Lansing Correctional Facility - Central | Theft |
|---|---|---|---|
| Sep 16, 2011 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Sep 16, 2011 | 1 | Lansing Correctional Facility - Central | Disobeying Orders |
| Sep 16, 2011 | 1 | Lansing Correctional Facility - Central | Avoiding an Officer |
| Sep 16, 2011 | 2 | Lansing Correctional Facility - Central | Insub/Disrespect Officer/Other |
| Mar 15, 2011 | 2 | Lansing Correctional Facility - Central | Unauthorized Dealing or Trade |
| Mar 15, 2011 | 2 | Lansing Correctional Facility - Central | Sex Explicit Mtrl, n/SexOfndr |
| Mar 15, 2011 | 2 | Lansing Correctional Facility - Central | Less Dangerous Contraband |
| Jan 22, 2011 | 1 | Lansing Correctional Facility - Central | Lewd Acts |
| Nov 11, 2009 | 3 | Lansing Correctional Facility - Central | Restr Area/Unauthor Presence |
| Jun 13, 2008 | 3 | Lansing Correctional Facility - Central | Violation of Published Orders |
| May 13, 2005 | 2 | Hutchinson Correctional Fac. - Central | Insub/Disrespect Officer/Other |
| May 13, 2005 | 1 | Hutchinson Correctional Fac. - Central | Disobeying Orders |
| May 13, 2005 | 3 | Hutchinson Correctional Fac. - Central | Restr Area and Unauth Presence |
| Jun 03, 2004 | 2 | El Dorado Correctional Fac. - Central | Falsifying Documents |



Ex. G
pt 2

FOCUS™ Terms cite(75-5256)          Search Within  Original Results (1 - 1) ▼   Go   Advanced...

View  Full  ▼
⇦ 1 of 1 ⇨
Book Browse | *Shepardize*®
K.S.A. § 75-5256  (Copy w/ Cite)

View Tutorial

Pages: 5

*K.S.A. § 75-5256*

LexisNexis (R) KANSAS ANNOTATED STATUTES                 **Practitioner's Toolbox**

*** This document is current through the 2012 Supplement ***          ⚖ **Case Notes**
*** Annotations current through June 10, 2013 ***                ⚖ **History**

Chapter 75. STATE DEPARTMENTS; PUBLIC OFFICERS AND
EMPLOYEES
Article 52. DEPARTMENT OF CORRECTIONS
CORRECTIONAL INSTITUTIONS; WARDENS; OFFICERS; INMATE ACTIVITIES

**GO TO KANSAS STATUTES ARCHIVE DIRECTORY**

K.S.A. § **75-5256** (2012)

**75-5256. Orders of warden; publication and availability to inmates of orders and rules and regulations.**

(a) The warden of each correctional institution may issue orders subject to the provisions of law and the rules
and regulations adopted by the secretary of corrections, as the warden may deem necessary for the government of
the correctional institution and the enforcement of discipline therein.

(b) All rules and regulations or orders for the government of a correctional institution and the enforcement of
discipline therein adopted or issued by the secretary of corrections and all orders issued by the warden of the
correctional institution shall be published and made available to all inmates, other than rules and regulations and
orders relating to emergency or security procedures. Every order issued by the warden of a correctional institution
shall be effective until rescinded or amended by the warden or until disapproved by the secretary.

☦ **History:**

L. 1973, ch. 339, § 46; L. 1978, ch. 120, § 21; L. 1990, ch. 309, § 65; May 24.

**NOTES:**

**Source or prior law:**

76-2410.

**CASE ANNOTATIONS**

1. Question whether prison officials were bound by their own rules raised (dissenting opinion). Griffin v. Raines, 2

(Ex H)

Case 5:11-cv-03200-DDC-KGS   Document 137   Filed 04/10/14   Page 62 of 66
https://doc.lexis.com/research/retrieve?_m=b5f4d9...

FOCUS™ Terms cite(75-5249)   Search Within  Original Results (1 - 1)   ▼  Go   Advanced...

View Full ▼

View Tutorial

◁ 1 of 1 ▷

Book Browse | *Shepardize®*

**K.S.A. § 75-5249** (Copy w/ Cite)

Pages: **2**

*K.S.A. § 75-5249*

LexisNexis (R) KANSAS ANNOTATED STATUTES       ▲**Practitioner's Toolbox**   ? ▣

\*\*\* This document is current through the 2013 Supplement \*\*\*       ⚑ History
\*\*\* Annotations current through October 30, 2013 \*\*\*

Chapter 75. STATE DEPARTMENTS; PUBLIC OFFICERS AND EMPLOYEES
Article 52. DEPARTMENT OF CORRECTIONS
CORRECTIONAL INSTITUTIONS; WARDENS; OFFICERS; INMATE ACTIVITIES

## GO TO KANSAS STATUTES ARCHIVE DIRECTORY

K.S.A. § **75-5249** (2013)

**75-5249. Chief physician; duties.**

   The secretary of corrections shall employ or contract with a person licensed to practice medicine and surgery to be the chief physician for each correctional institution under the secretary's supervision and control. One chief physician may be made responsible for more than one such institution. It is hereby made the duty of the chief physician of any correctional institution to direct the operation and management of such institution's medical services and to supervise and coordinate all inmate health care in such institution. Such physician may recommend to the warden of any institution the transportation of an inmate to an outside medical care facility, as defined by K.S.A. 65-425 and amendments thereto, when necessary to protect the health of such inmate.

⚘ History:

L. 1973, ch. 339, § 39; L. 1988, ch. 347, § 1; L. 1990, ch. 309, § 58; May 24.

NOTES:

**Source or prior law:**

76-2401.



( Ex. I )

View Full ▼

◁ 1 of 1 ▷

Book Browse | *Shepardize®*

**K.S.A. § 75-5249** (Copy w/ Cite)

Pages: 2

occur if the surgeon removes all or too much of the fat pads under the eyes), and dissatisfaction with the cosmetic results. [37]

In addition, many physicians themselves pose a risk of harm to minors seeking cosmetic surgery, because many physicians are not board-certified, a fact which does not need to be disclosed to the patient or potential patient. Currently, four specialty boards evaluate and certify physicians for the practice of plastic and cosmetic surgery, and each of them have differing requirements for certification. [38] However, a physician need not possess board certification to perform plastic surgery. [39] Because of this, and due to a desire by physicians to live a comfortable life and meet financial obligations, many physicians have been migrating into the cosmetic marketplace, [40] including cosmetic surgery [41] for which the physician need not have been trained. [42] Furthermore, many physicians feel confident that once they have provided non-surgical cosmetic treatments; they may more easily offer surgical ones. [43] From the patient's perspective too, surveys show that once a patient has had a non-surgical technique performed, the patient develops a relationship with the non-plastic surgeon such that they return to that doctor for surgical treatments. [44]

One commentator opined that the difference between earlier practice and this recent trend is the discovery of advertising. [45] Indeed, as long as the advertisement is paid for, a physician need not prove specialized board certification before advertising. [46] This is a problem because, unlike [*242] restrictions on legal advertisements [47] those seeking such services are left to the whims of those professionals in a position to mislead potential patients [48] about board certification, surgical training, or experience with the procedure. [49]

Furthermore, a growing part of the cosmetic surgery market is represented by *surgically* untrained physicians [50] -- also a fact which does not require disclosure for informed consent purposes. These are not cases in which surgically trained physicians are simply expanding their practice without certification to include cosmetic surgical treatments; instead, they are not trained at all in surgical technique. [51] In sum, despite the numerous risks associated with surgery, physicians need not obtain specialized board certification or training in surgical technique to perform plastic or cosmetic surgery. For example, though liposuction has a "very real possibility of patient morbidity or mortality [rate] when carried out in an inexpert fashion," it does not require board certification or even surgical training to perform. [52]

Furthermore, cosmetic surgery involves patient-specific risks arising from the mental illness of some minors. [53] While not conclusive, studies on adults provide a framework for considering relevant psychological issues for minors undergoing cosmetic surgery. [54] One such study has shown that [*243] up to 47.7% of all persons seeking cosmetic surgery meet the criteria for possessing a mental or personality disorder. [55] Statistics show **Body Dysmorphic Disorder** ("BDD") at 5-15%; Narcissistic Personality Disorder at 25%; and Histrionic Personality Disorders at 9.7%. [56] All these disorders [57] disturb the rational decision-making process regarding one's appearance. [58] Importantly, while the symptoms usually begin in early adolescence, the diagnosis is often missed due to typical adolescent bodily preoccupation. [59]

People with BDD believe the cause of their emotional distress is due to a defective appearance, and often turn to cosmetic surgery for treatment; however, those who undergo psychological treatment have greater success in overcoming those issues. [60] In one of the largest studies on people with BDD, their dislike of appearance began at age thirteen (plus or minus six years), and the mean age for full BDD onset was age sixteen (plus or minus seven years). [61] Further, the preoccupation can be over any specific part of the body, such as skin, hair, nose, genitals, height, hair, body build, weight, hips, legs, or breasts. [62] Over the course of the disorder, their preoccupation can be over five to seven body parts, with complaints ranging from specific body-parts to vaguer preoccupations (e.g., body just [*244] doesn't look right). [63]

Most importantly, a study shows that people with BDD have higher lifetime rates of suicidal ideation and attempted

Conley 60437

J BDD



suicide. [64] People with BDD have a 78% lifetime rate of suicidal ideation, for which BDD was the primary reason 55-70% of the time. [65] This rate is higher than the lifetime rates for any other psychiatric disorder (e.g., schizophrenia at 40-53%, or major depression at 55-56%). [66] Moreover, of those studied, 27% had previously attempted suicide, with BDD being the primary reason 36% of the time, [67] which is estimated to be 6 to 23 times higher than that of the general U.S. population. [68]

Similar to adults with BDD, adolescents with BDD also often seek cosmetic surgery. [69] In a study of two hundred people with BDD, 71% sought and 64% received cosmetic treatments. [70] Of these, sixteen of the two hundred were adolescents; and, of them, ten sought cosmetic treatments and nine received them. [71] Moreover, the mean age at which adolescents first sought cosmetic treatment was 14.8 years. [72] Among those with BDD, rhinoplasty (nose surgery), liposuction (fat removal), and breast augmentation are the most frequently sought after surgical treatments. [73] Additionally, a recent study found that for rhinoplasty alone, one in three applicants had symptoms of BDD. [74] This data is significant because studies of patients after having obtained cosmetic surgery either **[\*245]** show no symptom change at all or show symptoms had worsened. [75] Either way, the surgery's objective, to improve the patient's personal bodily outlook, was not accomplished. [76] Indeed, complete remission of BDD is rare, even after therapeutic treatment. [77]

Additionally, BDD is often misdiagnosed due to its concurrent existence with other psychopathologies and the unwillingness of people with BDD to share their distress with others. [78] They are also frequently able to conceal their BDD symptoms from their clinicians. [79] Indeed, cosmetic surgeons, precisely because they are not psychopathologists, have been experiencing ongoing difficulty recognizing and screening out applicants with mental disorders. [80] However, even where a physician recognizes the symptoms and refuses to treat, the applicant may still doctor-shop until the applicant finds one who will perform the procedure. [81] In sum, cosmetic surgery is a danger to adolescents with BDD due to the high risk of condition deterioration, [82] its diagnosis difficulty by trained mental health professionals, the rare likelihood of symptom remission, and high lifetime rates of suicidal ideation and attempted suicide.



### [\*246] C. Medical Decision-Making for Minors

#### 1. Constitutional Affects on Medical Decision-Making [83]

In *Troxel v. Granville* the Supreme Court held that parents have a fundamental right to the care, custody, and control of their children. [84] This fundamental right is a liberty interest protected under the Due Process Clause, and includes the rights to establish a home, to bring up children, and to control their education. [85] The *Troxel* Court also held that a fit parent is presumed to have acted in the best interest of their child(ren) -- a parental presumption. [86] The rationale is that parents have what a child lacks in maturity, experience, and capacity for judgment when making life's difficult decisions [87] ; and, due to their natural bond, said affections will lead parents to act in the best interest of their children. [88]

This fundamental parental right includes medical decision-making, on the reasoning that minors are incompetent and lack the ability to make mature decisions about their own well-being. [89] The rationale underlying informed consent -- a patient's comprehension of risks involved for a competent medical decision -- cannot be satisfied when a patient cannot understand a physician's disclosure, when a patient cannot exercise competent independent judgment, or when both occur. [90] Hence, special rules apply to those deemed incompetent. [91] One category of those deemed **[\*247]** incompetent is minors and, thus, physicians must obtain informed consent from parents, who are presumptively deemed competent on behalf of the minor. [92]

#### 2. State Intervention Exceptions

T-1

DISORDERS, AND OBESITY IN YOUTH: ASSESSMENT, PREVENTION, AND TREATMENT 304 (Myles S. Faith et al. eds., 2nd ed. 2009) (providing an overview of the psychological aspects of plastic surgery for young people, and using the findings from the adult literature as a framework to consider relevant psychological issues for children and adolescents undergoing these procedures).

⚓n55 Ritvo, *supra* note 53, at 194 (explaining that studies show up to 47.7% of patients seeking a consultation for a cosmetic procedure meet the criteria for a mental disorder).

⚓n56 *Id.*

⚓n57 Additionally, because adolescents with eating disorders often give disproportionate focus to their appearance, they also seek cosmetic surgery due to belief that it will improve their body image. Phillips, *infra* note 64. While there are no studies of individuals with eating disorders obtaining cosmetic surgery, there are case reports. SARWER, *supra* note 54, at 314. For example, in a report of two females (one age nineteen, the other twenty) with eating disorders, one underwent rhinoplasty and the other chin augmentation (both seemingly innocuous and routine cosmetic procedures). *Id.* Though, after surgery, they both experienced remission of their condition for the first few months, the symptoms only returned and worsened, resulting in one needing hospitalization. *Id.* Reports with the same result have also been made when people with such disorders have undergone breast augmentation and liposuction surgeries. *Id.* Therefore, surgery cannot cure people with eating pathologies or their associated body image disturbances. *Id.*

⚓n58 *Id.* at 195.

⚓n59 *Id.*

⚓n60 Canice Crerand, **Body Dysmorphic Disorder** *and Cosmetic Surgery*, 118 PLAST. RECONSTR. SURG. 167e, 174e (2006) (explaining that as a result of their perceived defect, these patients often turn to plastic surgeons, dermatologists, and other medical professionals for treatment. However, those who instead present for psychiatric and psychological treatment often have greater success).

⚓n61 *Id.* at 170e (explaining although most people with BDD do not seek treatment until their thirties, the mean age of full BDD onset is late adolescence).

⚓n62 *Id.* at 175e (explaining that 77% of persons with BDD have an obsessive preoccupation with a body part that rises to delusional levels and which may result in violence to others or do-it-yourself cosmetic procedures. In addition, a survey of cosmetic surgeons found that 2% had been physically threatened and 10% reported a threat of both violence and legal action).

⚓n63 *Id.* at 171e.

⚓n64 Katharine A. Phillips et al., *Suicidal Ideation and Suicide Attempts in* **Body Dysmorphic Disorder**, 66 THE J. OF CLINICAL PSYCHIATRY 717, 721 (2005).

⚓n65 *Id.* at 720 (explaining that of 200 subjects with BDD, 78% reported a history of suicidal ideation. Of those subjects with a history of suicidal ideation, BDD was the primary reason 70.5% of the time. Of the entire sample, BDD was the primary reason 55% of the time).

⚓n66 *Id.* at 721-22.

⚓n67 *Id.* at 720 (explaining that of 200 subjects with BDD, 27.5% had previously attempted suicide. BDD was reported to be the primary reason for 36% of the sample's 178 suicide attempts. Of those subjects with a history

J-2

Civil Procedure > Discovery > Privileged Matters > Work Product > Overview [icon]
Transportation Law > Private Vehicles > Traffic Regulation > Traffic Control Devices > Green Lights [icon]

FOOTNOTE-1:

Fn1 Glenn Bradford practices law in Kansas City.

Fn2 http://www.famousquotesandauthors.com/authors/oscar_levant_quotes.html.

Fn3 Kafman, Lang, Inman and Bos, of New Orleans, Louisiana.

Fn4 http://www.quotationspage.com/quote/28979.html.

Fn5 OLIVER WENDELL HOLMES, OVER THE TEACUPS 312 (Houghton, Mifflin and Co. 1890).

Fn6 Alison Clayton-Smith, *Helping Lawyers Overcome the Perfectionist Trap*, available at http://careocbaliforniancoaching.co.uk/temp/content/uploads/2007/07/helping-lawy-ers-overcome-the-perfectionist-trap-pdf.

Fn7 Alison Bechtel, *Dykes to Watch Out For* (calendar) (1990).

Fn8 MONICA RAMIREZ BASCO, NEVER GOOD ENOUGH HOW TO USE PERFECTIONISM TO YOUR ADVANTAGE WITHOUT LETTING IT RUIN YOUR LIFE, xii (Simon & Schuster 1999).

Fn9 *Id.*

Fn10 See, generally, MARTIN M. ANTONY & RICHARD P. SWINSON, WHEN PERFECT ISN'T GOOD ENOUGH: STRATEGIES FOR COPING WITH PERFECTIONISM (New Harbinger Publications 1998); ANN W. SMITH, OVERCOMING PERFECTIONISM: THE KEY TO A BALANCED RECOVERY (Heath Communication, Inc. 1990); RICHARD WINTER, PERFECTING OURSELVES TO DEATH (Inter Varsity Press 2005).

Fn11 300.3 Diagnostic Criteria for Obsessive-Compulsive Disorder (DSM IV).

A. Either obsessions or compulsions:

Obsessions as defined by (1), (2), (3), and (4):

1. recurrent and persistent thoughts, impulses, or images that are experienced, at some time during the disturbance, as intrusive and inappropriate and that cause marked anxiety or distress

2. the thoughts, impulses, or images are not simply excessive worries about real-life problems

3. the person attempts to ignore or suppress such thoughts, impulses, or images, or to neutralize them with some other thought or action

4. the person recognizes that the obsessional thoughts, impulses, or images are a product of his or her own mind (not imposed from without as in thought insertion)

Compulsions as defined by (1) and (2):

1. repetitive behaviors (e.g., hand washing, ordering, checking) or mental acts (e.g., praying, counting, repeating words silently) that the person feels driven to perform in response to an obsession, or according to rules that must be applied rigidly

2. the behaviors or mental acts are aimed at preventing or reducing distress or preventing some dreaded event or situation; however, these behaviors or mental acts either are not connected in a realistic way with what they are designed to neutralize or are clearly excessive

B. At some point during the course of the disorder, the person has recognized that the obsessions or compulsions are excessive or unreasonable. Note: This does not apply to children.

C. The obsessions or compulsions cause marked distress, are time consuming (take more than 1 hour a day), or significantly interfere with the person's normal routine, occupational (or academic) functioning, or usual activities or relationships.

D. If another Axis I disorder is present, the content of the obsessions or compulsions is not restricted to it (e.g., preoccupation with food in the presence of an Eating Disorder; hair pulling in the presence of Trichotillomania; concern with appearance in the presence of Body Dysmorphic Disorder; preoccupation with drugs in the presence of a Substance Use Disorder; preoccupation with having a serious illness in the presence of Hypochondriasis; preoccupation with sexual urges or fantasies in the presence of a Paraphilia; or guilty ruminations in the presence of Major Depressive Disorder).

E. The disturbance is not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition.

Fn12 301.4 Diagnostic Criteria for Obsessive-Compulsive Personality Disorder (DSM IV) A pervasive pattern of preoccupation with orderliness, perfectionism, and mental and interpersonal control, at the expense of flexibility, openness, and efficiency, beginning by early adulthood and present in a variety of contexts, as indicated by four (or more) of the following:

1. is preoccupied with details, rules, lists, order, organization, or schedules to the extent that the major point of the activity is lost

2. shows perfectionism that interferes with task completion (e.g., is unable to complete a project because his or her own overly strict standards are not met)

3. is excessively devoted to work and productivity to the exclusion of leisure activities and friendships (not accounted for by obvious economic necessity)

4. is over conscientious, scrupulous, and inflexible about matters of morality, ethics, or values (not accounted for by cultural or religious identification)

5. is unable to discard worn-out or worthless objects even when they have no sentimental value

6. is reluctant to delegate tasks or to work with others unless they submit to exactly his or her way of doing things

7. adopts a miserly spending style toward both self and others; money is viewed as something to be hoarded for future catastrophes

J-3